# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 9, 2007          Decided July 17, 2007

No. 05-5309

ENID W. WEBER,
APPELLANT

v.

ROBERT J. BATTISTA, CHAIRMAN, NATIONAL LABOR
RELATIONS BOARD,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00862)

*Michael P. Deeds* argued the cause and filed the briefs for appellant.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan* and *Stratton C. Strand*, Assistant U.S. Attorneys, entered appearances.

Before: GINSBURG, *Chief Judge*, and SENTELLE, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* Ginsburg.

Ginsburg, *Chief Judge*: Enid Weber appeals from the summary judgment entered by the district court in favor of her employer, the National Labor Relations Board, on Weber's claim that the Board discriminated against her and, when she complained, retaliated, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. We affirm that judgment insofar as the district court held Weber has not shown the Board's explanations for numerous alleged acts of discrimination were false or that discrimination or retaliation was among the real reasons for any of them. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). We reverse that judgment insofar as the district court dismissed her claims (1) that the Board discriminatorily failed to select her for a higher position, which the court dismissed on the ground that Weber did not exhaust her administrative remedies; and (2) that certain performance evaluations, which allegedly caused her not to receive an award, were not materially "adverse employment actions." We remand this case for the district court to resolve on the merits the claims it dismissed.

## I. Background

Enid Weber, an Hispanic woman, was employed by the Board from 1971 until her retirement in 2006. From 1989 onward she was an Associate Executive Secretary to the Chairman.

In 1997 Weber sought informal counseling with the Board's Office of Equal Employment Opportunity (OEEO), as required before she could file a Title VII action in district court. *See* 29 C.F.R. § 1614.105(a). She alleged the Board had discriminated against her in numerous ways based upon her sex and national origin and had retaliated against her for complaining by denying

her "equal pay for equal work," in violation of the Equal Pay Act, 29 U.S.C. § 206(d). When the parties were unable to resolve Weber's grievance informally, she filed a formal administrative complaint with the OEEO alleging the Board had discriminated and retaliated against her, in violation of Title VII, when it: (1) failed to select her to be the Acting Deputy Executive Secretary; (2) treated her differently than other employees with regard to her performance appraisal; (3) barred her from assigning work to the secretarial staff; (4) isolated her and took measures to keep information from her; (5) denied her access to Board members, Chief Counsels, Board supervisors, and Board staffs; (6) chose another employee to handle "agendas and ... other meetings with the Board members and/or with Chief Counsels"; and (7) took certain duties away from her. She also continued to allege that the Board had not paid her as required by the Equal Pay Act.

On August 9, 1999 Weber sent a memorandum to the OEEO "amending [her] pending EEO charges to include as an act of retaliation and/or of discrimination the permanent reassignment ... of Lester A. Heltzer as Deputy Executive Secretary ... with ... the consequent bypassing of [Weber]." The Acting Director of the OEEO responded, saying Weber's "amended complaint ... has been accepted for processing," and the OEEO's contractor later investigated the issue raised in the amendment.

When the time allowed had passed with no final decision from the OEEO, *see* 29 C.F.R. §§ 1614.108(e), 1614.110, Weber filed a complaint in district court raising all the claims listed above. The district court transferred Weber's claim under the Equal Pay Act to the Court of Federal Claims, which has exclusive jurisdiction over claims against the federal government exceeding $10,000, and granted partial summary judgment in favor of the Board on Weber's Title VII claims.

4

*Weber v. Hurtgen*, 297 F. Supp. 2d 58, 62, 69 (D.D.C. 2003) (*Weber I*). In the latter respect, the district court first held Weber had failed to exhaust her administrative remedies insofar as she amended her formal complaint to add her claim of nonselection without having first sought informal counseling. *Id.* at 66-67. The court also held that neither of the performance evaluations she challenged amounted to an "adverse employment action" and therefore did not support a prima facie case of discrimination or retaliation. *Id.* at 64-65. More specifically, the court reasoned that the 1997-98 performance evaluation, which rated Weber from "fully successful" to "outstanding" on four "critical elements" without assigning a "rating of record," was not adverse because Weber still received a "special act award" — 80 hours of leave — which was comparable to what other similarly situated employees had received as performance awards. *Id.* at 64. The district court concluded that Weber's rating of "commendable" for the 1998-99 rating period was not an adverse action because it was "not 'adverse in an absolute sense'" and her "salary and grade were not impacted." *Id.* (quoting *Brown v. Brody*, 199 F.3d 446, 458 (D.C. Cir. 1999)).

The court also "invite[d] the [Board] to file a renewed motion for summary judgment on the specific issue of whether the [Board] had legitimate, nondiscriminatory reasons for the multitude" of allegedly discriminatory or retaliatory acts of which Weber had complained. *Id.* at 69. When the Board did so, the district court entered summary judgment for the agency, concluding Weber had failed to meet her burden of proving the justifications offered by the Board were false and the real reason was discrimination or retaliation. *Weber v. Battista*, 2005 WL 4908965, at *1-3 (D.D.C. Mar. 17, 2005).

## II. Analysis

On appeal, Weber first argues the district court erred in dismissing both her claim regarding her nonselection as Deputy Executive Secretary on the ground that she had failed to exhaust her administrative remedies before filing suit, and her claims regarding her performance ratings, which the court held were not materially adverse employment actions. Title VII provides that "[a]ll personnel actions affecting employees ... in executive agencies ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Where, as here, a plaintiff proffers only indirect evidence of unlawful discrimination, her case is subject to the three-part test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973):

> Under *McDonnell Douglas*, it is the plaintiff's burden to establish a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff establishes a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for its actions. The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory.

*Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002) (citations omitted). Accordingly, Weber also argues that she met her burden of proof by showing each of the numerous acts of which she complained was a pretext for discrimination or retaliation.

## A. Exhaustion

Under regulations promulgated by the Equal Employment Opportunity Commission (EEOC) to implement Title VII, an employee of the Executive Branch of the federal government who believes she has been "discriminated against on the basis of ... sex [or] national origin ... must consult a Counselor [in the

agency's OEEO] prior to filing a [formal administrative] complaint in order to try to informally resolve the matter," and "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory."[*] 29 C.F.R. § 1614.105(a)(1). The OEEO "shall dismiss" the complaint insofar as it "raises a matter that has not been brought to the attention of a Counselor and is not like or related to a matter that has been brought to the attention of a Counselor." 29 C.F.R. § 1614.107(a)(2).

The Board contends Weber failed to exhaust the claim concerning her nonselection because she added it by amending her formal administrative complaint without first having sought informal counseling with regard to that claim. According to the Board, the Supreme Court's teaching that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *cf. Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162, 2166-72 (2007), should be applied equally to an allegedly discriminatory or retaliatory act occurring after the filing of a formal complaint, because doing so promotes the informal resolution of claims. *See Horton v. Potter*, 369 F.3d 906, 908-10 (6th Cir. 2004).

Weber makes two arguments that she did exhaust her administrative remedies. First, Weber argues her memorandum of August 9, 1999 to the OEEO "initiate[d] contact with [a] ... Counselor" within 45 days (indeed, within three days) of the Board's having selected Lester Heltzer instead of her to be the Deputy Executive Secretary. 29 C.F.R. § 1614.105(a)(1). Alternatively, she contends she properly raised the claim

---

[*] An employee of a covered employer other than the Executive Branch would file her charge of discrimination or retaliation with the EEOC. 42 U.S.C. § 2000e-5(e)(1).

regarding her nonselection by amending her formal administrative complaint to include the new count because her new claim was "like or related to" the count in that complaint claiming she had been passed over for the position of Acting Deputy Executive Secretary. Here she invokes another regulation of the EEOC, which provides, "A complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." § 1614.106(d). As the EEOC has interpreted this provision, a new claim is "like or related to" a pending claim if it "could have reasonably been expected to grow out of the original complaint during the investigation." *Core v. Brownlee*, 2004 WL 189570, at \*1 (E.E.O.C. Jan. 23, 2004). If the new claim meets this requirement, then "[t]here is no requirement that the amendment be subject to counseling." *Id.*

In the wake of *Morgan*, two circuits have considered and reached different conclusions with respect to whether a claim arising after the filing of a formal administrative complaint must be raised with the EEOC or, if the complaint is against a federal agency, with the agency's OEEO, before being brought before a district court. The Eighth Circuit in *Wedow v. City of Kansas City*, 442 F.3d 661, 673-74 (2006), held a plaintiff need not separately exhaust her administrative remedies with respect to "subsequent retaliatory acts ... of a like kind to the retaliatory acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature." Instead, the Eighth Circuit entertained such claims, although they were raised for the first time in the complaint filed in district court. *Id.* at 672.

In *Martinez v. Potter*, 347 F.3d 1208, 1210 (2003), the Tenth Circuit read *Morgan* as having "effected fundamental changes to the [continuing violation] doctrine allowing administratively unexhausted claims in Title VII actions."

Henceforth, a complainant must start anew before the EEOC or the employing agency's OEEO before raising in the district court a "discrete claim[] based on incidents occurring *after* the filing of [the formal administrative] complaint," *see id.* at 1210-11, apparently without regard to whether the after-arising claim is like or related to a claim in the administrative complaint and to whether the plaintiff had alleged the discrimination was ongoing. *Id.*

In this case, we need not adopt either of the foregoing views in order to conclude, pursuant to her alternative argument, that Weber exhausted her administrative remedies with regard to her claim of discriminatory nonselection for the position of Deputy Executive Secretary. As contemplated in 29 C.F.R. § 1614.106(d) and *Core*, that claim "could have reasonably been expected to grow out of" her earlier complaint concerning her nonselection as Acting Deputy Executive Secretary, and the two are therefore "like or related." The OEEO may entertain such a claim even though it was raised after the filing of the formal administrative complaint, 29 C.F.R. § 1614.107(a)(2), and here the OEEO did just that; by inquiring of Weber's immediate supervisor, Executive Secretary John Toner, the OEEO investigated and put the Board on notice of the matter. Therefore, we conclude Weber gave the Board an opportunity to resolve her claim administratively before she filed her complaint in district court. Accordingly, we remand this aspect of the case for the district court to resolve on its merits Weber's claim with respect to her nonselection as Deputy Executive Secretary.

B. Performance Evaluation as Adverse Action

Weber also contends the Board retaliated against her by lowering the "rating of record" on her performance evaluations for 1997-98 and 1998-99, as compared to her ratings for

previous years. In order to make out a prima facie case of retaliation, Weber must demonstrate that she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her. *Jones v. Wash. Metro. Area Transit Auth.*, 205 F.3d 428, 433 (D.C. Cir. 2000); *Ethnic Employees of the Library of Congress v. Boorstin*, 751 F.2d 1405, 1415 n.13 (D.C. Cir. 1985) (noting § 2000e-16, which is silent on the subject, nonetheless prohibits retaliation against a federal employee who has invoked Title VII). The Board defends the district court's holding that neither performance evaluation was a materially adverse employment action.

Toner rated Weber's performance for 1997-98 from "fully successful" to "outstanding" with respect to the four critical elements of her job, but did not give her an overall rating. For 1998-99, he rated her from "commendable" to "outstanding" on the same four critical elements and gave her an overall rating of "commendable." Weber contends that giving her lower ratings on critical elements in 1998 and a lower overall performance rating in 1999 than in past years were adverse actions; they caused her to lose a performance award, and are therefore "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2409 (2006).

The Board contends there is no evidence relevant to Weber's contention that the lowered performance ratings in her performance evaluations for 1997-98 and 1998-99 caused her to lose a performance award for either period, and points out that such awards are "optional" with the agency: As provided in a 1994 Administrative Policy Circular, "Employees with ratings of record of 'Outstanding', 'Commendable' or 'Fully successful' *may* receive performance awards," but the failure to receive an "optional performance award may not be appealed." Finally, the

Board argues there is no evidence Weber's performance rating was "unusual for Weber over the course of her time at the NLRB" or less favorable than the rating of any comparably situated employee.

Unlike the Board, we see in the record evidence sufficient for a reasonable jury to conclude that the Board gave performance awards upon the basis of each the employee's rating of record in his or her annual performance evaluation. The self-same Administrative Policy Circular upon which the Board relies flatly states, "The results of performance appraisal serve as the basis for performance award decisions," and "Performance Awards are based on an employee's rating of record." Moreover, Weber's previous ratings of record and correlative performance awards are consistent with this causal relationship. For example, she was rated "outstanding" and received a quality step increase, apparently as a performance award, for the 1994-95 rating period. (For the 1995-96 rating period, Weber received another quality step increase, but the record does not indicate her rating of record for that period.) For the 1996-97 rating period, she was rated "Outstanding" and received a performance award of $2,335.[*]

In *Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002) we held the Board "was not entitled to summary judgment on [the plaintiff's] 1997 performance evaluation because that review was conducted after [the plaintiff] engaged in protected activity ... and he sufficiently alleged loss of 'a tangible, quantifiable award,'" in the form of a performance or cash award, which he had received "nearly every year" before he filed a complaint of

---

[*] According to the 1994 Administrative Policy Circular, a "cash award" may be provided as "[s]pecial recognition for other types of accomplishments" and given in addition to any performance award.

discrimination with the Board's OEEO. *See also Russell v. Principi*, 257 F.3d 815, 818-19 (D.C. Cir. 2001) (holding bonus diminished as result of performance evaluation is adverse action with respect to Title VII plaintiff alleging lesser performing colleague received better evaluation and, therefore, larger bonus). So, too, here; though performance awards are indeed optional with the employer, the record shows the Board had opted to give Weber an award in each of the three years preceding 1998, the year in which she complained of discrimination and received no such award.

In 1998, Weber did receive a "special act award" of time off but that does not diminish the significance of her allegation that she was discriminatorily denied a performance award for the 1997-98 rating period. But for possible retaliation by the Board, Weber might have received both a performance award and a special act award, as she did in 1995. Moreover, the two performance evaluations that Weber challenged, though they may not, as the district court said, be "adverse in an absolute sense," do qualify as adverse actions insofar as they resulted in her losing a financial award or an award of leave, because a reasonable jury could conclude that such a loss "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 126 S. Ct. at 2409. We therefore remand this aspect of the case for the district to determine whether Weber proved her allegation of retaliation with respect to her nonreceipt of performance awards in 1998 and 1999.

C. Pretext

In order to prove the Board's explanations for alleged acts of discrimination or retaliation are pretextual, Weber must show "*both* that the reason was false, *and* that discrimination [or retaliation] was the real reason." *See St. Mary's Honor Ctr. v.*

*Hicks*, 509 U.S. 502, 515 (1993). The district court held that Weber failed to show the Board's explanations for numerous alleged acts of discrimination or retaliation were false or that the real reason was discriminatory or retaliatory.

1. Direct Assignments to Support Staff

The Board "withdrew [Weber's] ability to directly assign work to the secretarial staff." Weber points to a memorandum from Toner in which he directed that "all requests from [Weber] for staff support assistance are to go through Mary Ebron as office manager or in her absence to me."

In response the Board relies upon Toner's sworn declaration, in which he explained that he took this step because Weber had shown poor judgment in asking one staff member to type a sensitive memorandum regarding another staff member who worked at a desk nearby. In addition, he said, four of the 16 members of the support staff had complained about how Weber had treated them before Toner restricted her ability to assign tasks to them.

Weber counters that Toner did not restrict her access to support staff until she made her informal complaint to the OEEO — timing that Weber argues gives rise to an inference of retaliation. In his declaration, however, Toner said he had delayed confronting Weber in order to consult with the Board about how best to deal with her lapse in judgment. Weber offered no evidence to cast doubt upon Toner's explanation or to show the real reason for limiting her ability to assign tasks to support staff was discriminatory or retaliatory.

2. Access to Information

Weber alleged the Board left her out of meetings, thereby

denying her access to information necessary to do her job. She points to an email she wrote (apparently to Messrs. Heltzer and Toner) asking about new procedures for handling certain types of cases, which Heltzer had discussed in a meeting with the legal clerks. As the Board points out, Heltzer responded to that email, explaining those new procedures to Weber and others. In reply Weber cites her statement of undisputed material facts, in which she says the Board "isolated her and took measures [to] restrict from her information within the Office of the Executive Secretary." This statement simply does not show that Heltzer refused to provide Weber with the information necessary to do her job, and their exchange of emails suggests the opposite.

3. Access to Board Offices

Weber alleged Toner "denied [her] access to Board Members, Chief Counsels, Deputy Chief Counsels, Board supervisors, and Board staff." Toner explained that he did so because Weber had shown "extremely poor judgment in her dealings with Board members." Specifically, Toner said Chairman Gould had told him Weber had served as his "spy" in the Office of the Executive Secretary and was reporting information to Gould regarding other Board members. Weber responds that Gould, in a sworn affidavit of his own, denied Toner's allegations, claiming instead he told Toner that Weber was not his spy but his "eyes and ears" and that he relied upon her to advise him "about the operations of the Board i.e. how it was functioning and how it should be functioning in connection with her realm of responsibility." The terminological quibble is irrelevant; Toner believed it "inappropriate" for Weber to act as Gould's "eyes and ears" and to report to him the activities of other Board members; accordingly he restricted her access to certain offices. Weber produced no evidence tending to show that Toner's explanation was false or that his real reason was discrimination or retaliation.

4. Board Agenda Meetings

Weber alleged that Toner "bypassed [her] for participation in agendas." Toner countered in his declaration: "To my knowledge, Ms. Weber never regularly attended Board agenda ... meetings .... I did nothing whatsoever to limit Ms. Weber's attendance at such meetings." In reply, Weber cites her statement of undisputed material facts, in which she stated that she was not permitted to attend Board agenda meetings, although her predecessors as the Associate Executive Secretary with the most seniority had done. Weber offers nothing, however, to suggest that she had previously attended such meetings or that Toner's denial that he limited her participation is false and therefore has failed to demonstrate pretext.

5. "C Cases"

Weber alleged the Board took away her responsibility for handling letters in unfair labor practice cases, known as "C Cases," that came to the Board on a stipulated record. Toner said he did "not recall Ms. Weber having responsibility for sending out" letters "informing the parties of scheduling and other matters" in such cases, and she "generally did not perform this duty." Toner believed other employees, perhaps staff in the Solicitor's Office, had handled that task.

In response, Weber produced a two-sentence letter she sent to two lawyers in 1998, informing them the Board had "received the stipulation of facts executed by all parties" and it "will be forwarded now to the Board for its consideration." Weber also produced a statistical analysis of the number of "C cases" filed and how quickly the Board processed them.

Weber's evidence does not show the Board's explanation is

false. A single exemplar of a letter from Weber to the parties regarding a "C case" is not inconsistent with Toner's recollection that Weber was not "generally" responsible for sending letters to parties in "C cases" with a stipulated record.

6. "Superpanel Cases"

Weber alleged that Toner "removed from [her] the duties of handling of superpanels." The Board asserts Weber was and continued to be responsible for "monitoring" superpanel cases, but never had been responsible for "handling" them, by which the Board means she did not attend superpanel meetings, take notes of the proceeding, or follow up to make sure decisions were issued on time. Toner explained that either Hollace Enoch or he performed those tasks. Weber points to Toner's evaluation of her work for 1996-97, in which he said "she has done an outstanding job in monitoring ... superpanel cases," but that is obviously consistent with Toner's explanation. Thus, Weber failed to show she ever did anything other than monitor superpanel cases, and hence failed to demonstrate the Board's version of events was false.

7. Case Status Reports

Weber also alleged the Board "removed from [her] the duties of preparation of case status lists." Toner acknowledges having taken away Weber's responsibility for preparing certain case status reports in 1995, when he first became Executive Secretary — well before Weber filed her informal complaint — and explains that he did this so he would be familiar with the cases pending before the Board, an explanation Weber does not appear to contradict. Toner also points out that Weber continued to have responsibility for preparing certain statistical reports regarding cases pending before the Board.

Weber responds that responsibility for "preparation of the substantive case lists," apparently the particular responsibility with respect to case status reports about which Weber complained, was reassigned to Heltzer, in proof of which she provides examples of such lists prepared by him. Missing from the record, however, is any evidence that Weber ever had responsibility for preparing "substantive case lists," an evidentiary gap consistent with Toner's explanation that after 1995, Weber had responsibility for preparing only "statistical reports." Weber therefore failed to show the Board's explanation is false.

8. "R Cases"

Weber alleged the Board "removed from [her] the duties of handling representational matters." In his declaration, Toner said Ms. Enoch generally handled "R cases" and "Ms. Weber rarely got involved." In response, Weber cited only an unauthenticated and therefore inadmissible note she wrote to Toner purporting to confirm that Toner had said she was "not to handle [her] R case procedural matters, but to turn them over to Hollace Enoch." Because Weber provided no admissible evidence that she ever had the duty of handling "R Cases," she failed to rebut the Board's explanation.

### III. Conclusion

We reverse the judgment of the district court dismissing Weber's claim that the Board impermissibly passed her over in selecting a new Deputy Executive Secretary, and remand this matter for the district court to adjudicate the merits of that claim. We also reverse the district court's judgment of dismissal with respect to her 1998 and 1999 evaluations, and remand for the district court to determine whether Weber proved her allegation that the Board retaliated against her by twice failing to give her

a performance award.  The judgment of the district court on the merits of Weber's other claims is affirmed.

*So ordered.*