Opinion for the Court filed by Circuit Judge GINSBURG.
Dissenting opinion filed by Circuit Judge ROGERS.
GINSBURG, Circuit Judge:
Ruby Taylor, an African-American woman, sued her employer, the Pension Benefit Guaranty Corporation, under Title VII of the Civil Rights Act of 1964, claiming her supervisors sexually harassed her to the point of creating a hostile work environment and, when she complained, retaliated against her. The district court granted summary judgment to the Corporation because it concluded, as a matter of law, (1) the employer had an affirmative defense to Taylor’s claim of sexual harassment and, (2) with regard to retaliation, Taylor (a) had not offered a prima facie showing that her protected activity caused most of the alleged acts of retaliation, (b) had failed to show one such act was a materially adverse action, and (c) had failed to rebut the Corporation’s nondiseriminatory explanation of another. We affirm, holding as a matter of law that the PBGC has an affirmative defense to the claim of sexual harassment and that Taylor has failed to meet her burden regarding the claim of retaliation.
I. Background
We accept as true the evidence offered by, and draw all reasonable inferences in favor of, Taylor, who at all relevant times was an auditor in the Pre-Termination Process Division (PPD) of the PBGC.* Taylor’s direct supervisor was Jonathan Henkel, who oversaw all the auditors in the PPD. Robert Bacon oversaw all the financial analysts in the PPD. Bacon and Henkel reported to Robert Joy, the manager of the PPD, who reported to Bennie Hagans, Director of the Insurance Operations Department (IOD).
The Corporation’s policy against sexual harassment directs employees who believe they have been sexually harassed “immediately [to] contact an EEO Counselor or the EEO Manager,” who is to investigate the charge of harassment and, if warranted, implement an appropriate remedy. The policy also states the “PBGC’s managers and supervisors have a particular responsibility for providing a work environment free of ... sexual harassment.”
Taylor alleges her supervisors created a sexually charged atmosphere at the PPD. Henkel, Joy, and Hagans occasionally flirted with female employees, but particularly offensive to Taylor was a summer 2001 scavenger hunt, undertaken as a “team building exercise,” during which, in order to earn points for a “wow,” a female coworker produced a yellow brassiere from her gym bag, and a male coworker asked Taylor, who had red hair, if her hair was red “all over.” Bacon and Henkel awarded Taylor’s team bonus points for what Henkel referred to as this “embarrassing moment.”
According to Taylor, Bacon began in 2001 to engage in frequent acts of harassment. Although Taylor and Bacon had been running partners for nearly a year, Taylor stopped running with him in the summer of 2001 because she felt he had overstepped the bounds of a professional relationship. In October Bacon told Taylor he could persuade Henkel to give her a good performance evaluation. When *1297 Henkel did so, Bacon asked her, “what are you going to do for me?” Around the same time, Taylor posted on her office door an October 2, 2001 e-mail detailing the Corporation’s policy concerning sexual harassment. In or before November Bacon began intimating Taylor was not in love with her fiance, saying he could beat him up. Taylor confided in her friend, David Smith, a team leader in the IOD, that she felt harassed; he did not advise her to go to the EEO Counselor, nor did he do so himself.
Also in 2001 Taylor confronted Bacon and threatened to report him if he did not stop sexually harassing her. Bacon said that because he was a “nice guy,” everyone “would think ... [she was] the problem.” On April 3, 2002 Bacon saw Taylor in the hall and, referring to her uncovered arms, said, “I see you flaunting that black.” The next day, when Bacon entered her office, Taylor kept her back to him; Bacon asked repeatedly, “what did I tell you about turning your back to me when I’m talking to you,” which Taylor ascribed to a desire on his part to “see my legs or chest.” A day later Bacon, finding Taylor alone in the copy room, walked toward her with his hands raised as if, in her view, he was preparing to choke her. When she protested, he did not touch her, but he called her “baby” and said he would touch her if he wanted.
Taylor reported Bacon’s conduct on April 9, 2002. She first filed a complaint with the PBGC’s internal investigator, who did not find a violation of the Corporation’s policy. When her complaint to the EEO office had proved unavailing, she brought this suit in the district court on August 19, 2003.
Taylor alleges her supervisors retaliated against her in response to her complaint and her lawsuit. In 2002 Hagans criticized her “negative behaviors.” Joy and Henkel, who had evaluated her job performance as “Outstanding” in 2001, rated her work “Excellent” in 2002 and “Fully Effective” in 2003, and in the third quarter of 2003 required her to submit biweekly reports of her progress on pending cases. In November 2003, after Taylor had submitted a confusing request for leave, Henkel, at the direction of the Human Resources Department, listed Taylor as AWOL. (The listing was later rescinded and Taylor received back pay.) Finally, in 2004 Joy refused to recommend Taylor for a new position the PBGC considered creating but ultimately did not create. Taylor filed a second EEO complaint on February 5, 2004 and a second lawsuit on April 22, 2005, claiming continued harassment and retaliation.
The district court consolidated Taylor’s lawsuits and granted the PBGC’s motion for summary judgment. See Taylor v. Chao, 516 F.Supp.2d 128, 130 (2007). With respect to Taylor’s claim of sexual harassment, the court held the Corporation’s anti-harassment policy and complaint procedure together with Taylor’s delay in reporting Bacon provided, as a matter of law, an affirmative defense. Id. at 134-35. In the alternative, the court held Taylor had not shown a reasonable jury could find her supervisors’ conduct created a hostile environment. Id. at 135-37. As for retaliation, the court concluded, with respect to most of Taylor’s claims, she had not produced prima facie evidence showing her filing the April 2002 complaint caused her supervisors to retaliate against her. Id. at 138. The court also held Hagans’s criticism of Taylor’s “negative behaviors” was not a “materially adverse act.” Id. at 137-38. Finally, the court held Taylor had made out a prima facie case of retaliation with respect to the performance evaluation she received in 2002 but had failed to rebut the PBGC’s legitimate explanation for that evaluation. Id. at 138-39.
*1298 II. Analysis
We review the judgment of the district court de novo. See Venetian Casino Resort, L.L.C. v. EEOC, 530 F.3d 925, 929 (D.C.Cir.2008). We begin with Taylor’s claim of sexual harassment and then turn to her claim of retaliation.
A. Sexual Harassment
Title VII provides: “All personnel actions Affecting employees ... in executive agencies ... shall be made free from any discrimination based on ... sex,” 42 U.S.C. § 2000e-16(a), and thus makes it unlawful for a supervisor in a covered federal agency to create a hostile environment based upon an employee’s sex. See Bundy v. Jackson, 641 F.2d 934, 944-46 (D.C.Cir.1981). Sexual harassment creates a hostile environment only if it is so “severe or pervasive [as] to alter the conditions of [the victim’s] employment and create an abusive working environment.” Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The employer has an affirmative defense to a hostile environment claim if (1) the employer “exercised reasonable care to prevent and correct promptly any sexually harassing behavior” and (2) “the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); see also Burlington Indus, v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).
The PBGC argues Taylor was not subjected to a hostile work environment and, in any event, the district court correctly held the employer had an affirmative defense because Taylor unreasonably failed to use its complaint procedure. See Ellerth, 524 U.S. at 765, 118 S.Ct. 2257 (“any unreasonable failure to use any complaint procedure provided by the employer ... will normally suffice to satisfy the employer’s burden”). Taylor does not challenge the adequacy of the Corporation’s procedure. Therefore, the PBGC may avoid liability if it shows “that, as a matter of law, a reasonable person in [Taylor’s] place would have come forward early enough to prevent [the] harassment from becoming ‘severe or pervasive.’ ” Greene v. Dalton, 164 F.3d 671, 675 (D.C.Cir.1999).
We agree with the district court and the PBGC that a reasonable employee in Taylor’s position would have come forward in October or November 2001, when Taylor instead posted the PBGC’s sexual harassment policy on her office door and told her Mend Smith that Bacon had been sexually harassing her. A reasonable employee who believes and tells others she is being sexually harassed would report it if she knows — as Taylor should have and apparently did know- — -a complaint procedure has been established for that purpose.* When Taylor finally did report Bacon’s conduct in April 2002, the PBGC duly investigated and, even though it did not find harassment, see Baskerville v. Culligan Int’l Co., 50 F.3d 428, 430 (7th Cir.1995) *1299 (occasional vulgar banter not sexual harassment), the sort of conduct about which Taylor had complained did not recur.
Taylor argues she effectively notified the PBGC’s management of her complaint in the fall of 2001 when she confided in her friend Smith. Taylor, however, could not reasonably have believed talking to Smith was a substitute for using the agency’s complaint procedure. Although Smith, as a member of management, may have had, as the policy states, a “particular responsibility” to address workplace discrimination, he was neither Bacon’s supervisor nor an EEO officer. The policy expressly required Taylor, if she believed she was being harassed, “immediately [to] contact an EEO Counselor or the EEO Manager.” Having ignored the complaint procedure, Taylor cannot now complain that Smith should have filed a formal complaint on her behalf or himself reprimanded Bacon, who did not report to him.
Taylor also argues her report to Smith was sufficient in the light of Bundy, in which we held an employer vicariously liable for its supervisors’ harassment of a subordinate. In Bundy, however, the employer, unlike the PBGC, had not established a sexual harassment policy with a complaint procedure. See 641 F.2d at 943, 947-48.
Taylor argues in the alternative that her delay in filing a complaint, from the fall of 2001 to April 2002, was not unreasonable. But, as the PBGC points out, an employee has a “prompt reporting duty under the prophylactic rules” approved in Faragher, and five or six months is “anything but prompt.” Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1306-07 (11th Cir.2007) (three months and two weeks held an unreasonable delay). In reply Taylor notes a failure to complain may be reasonable in unusual circumstances, such as a “genuine [and] reasonable .... fear of retaliation.” Adams v. O’Reilly Auto., Inc., 538 F.3d 926, 932-33 (8th Cir.2008) (“fear of retaliation” generally not an excuse for failing to report sexual harassment); see also Roebuck v. Washington, 408 F.3d 790, 795 (D.C.Cir.2005) (“fear and uncertainty” about scope of employer’s policy may in certain circumstances make employee’s “delay in complaining reasonable”).
Taylor suggests various “factors” show her delay was reasonable but only one warrants mention. According to Taylor’s first EEO complaint, Bacon told her in 2001 “no one would believe” her if she reported him; “they would think ... [she was] the problem.” A reasonable jury could not find Taylor was reasonably deterred by Bacon’s statement. Bacon did not threaten Taylor with an adverse employment action and, indeed, he could not have done because he was not her supervisor and did not have the authority to evaluate her performance or to take any action against her. In fact, Bacon had no leverage at all with which to intimidate Taylor — apart from his assertion that those in authority would believe him and not her. And that is not enough to establish a credible fear of retaliation. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir.2001) (rejecting as “speculative” and “generalized” employee’s fear of retaliation based upon alleged friendship between president of corporation and alleged harasser, her supervisor); id. at 268 (rejecting view that “friendships should relieve an employee of her reporting obligation and effectively impose automatic liability on the employer”). Because “failure [would have been] the only cost” to Taylor of reporting Bacon in the fall of 2001, see Reed v. MBNA Mktg. Sys., 333 F.3d 27, 36 (1st Cir.2003); see also Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1290-91 (11th Cir.2003) (absent credible threat of retaliation, subjective fear of reprisal not an excuse for failure to report), no reason *1300 able jury could find Taylor reasonably waited five or six months before reporting what she believed was sexual harassment.* We therefore affirm the district court’s judgment with respect to Taylor’s first cause of action.
B. Retaliation
Under Title VII, it is unlawful for an employer “to discriminate against any of [its] employees ... because [she] has made a charge ... or participated in any manner in an investigation” of discrimination. 42 U.S.C. § 2000e-3(a); see Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.Cir.2006) (“general ban on retaliation in § 2000e-3(a)” applies to federal employers through § 2000e-16). In order to prevail upon a claim of unlawful retaliation, an employee must show “she engaged in protected activity, as a consequence of which her employer took a materially adverse action against her.” Weber v. Battista, 494 F.3d 179, 184 (D.C.Cir.2007). A materially adverse action is one that “could well dissuade a reasonable worker from making or supporting a charge of discrimination.” Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); see Rochon, 438 F.3d at 1219. The district court held Taylor had failed to show that her filing the April 2002 complaint had been the cause of four of the reprisals she alleged, had failed to show material adversity with respect to one, and had failed to rebut the PBGC’s nondiscriminatory explanation of another.* See Taylor, 516 F.Supp.2d at 138-39. We affirm the district court on the ground that five of the six alleged reprisals were not materially adverse actions and Taylor cannot show the sixth was retaliatory.**
*1301 First. Hagans criticized Taylor for exhibiting “negative behaviors.” The district court held, and we agree, that Hagans’s criticism was not a materially adverse action. See id. at 138; see also Burlington Northern, 548 U.S. at 68, 126 S.Ct. 2405 (“petty slights [and] minor annoyances” would not deter reasonable employee from making charge of discrimination).
Second. Henkel and Joy slowed the processing of Taylor’s cases after she filed her complaint and Joy and Henkel required her (as they had some other auditors) to submit biweekly reports on the status of her work. Such minor “inconveniences and alteration of job responsibilities [do] not rise to the level of adverse action” necessary to support a claim. Stewart v. Evans, 275 F.3d 1126, 1135 (D.C.Cir.2002); see Wiley, 511 F.3d at 161 (change in workload a trivial harm); cf. Holcomb v. Powell, 433 F.3d 889, 897 (D.C.Cir.2006) (“We have consistently declined to serve as a ‘super-personnel department’ ”); accord Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir.1986).
Third. Joy did not recommend Taylor for a position the PBGC was considering creating but ultimately did not create. Although a refusal to promote is a materially adverse action, see Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C.Cir.2003), because there was no position to which she might have been promoted, Taylor was not denied a tangible opportunity to advance her career. Cf. Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C.Cir.2008) (“evaluations and written warnings were not adverse actions because none had ‘tangible job consequences’ ” (construing Whittaker v. N. Ill. Univ., 424 F.3d 640, 648 (7th Cir.2005))); Brown v. Brody, 199 F.3d 446, 457 (D.C.Cir.1999) (plaintiff must show “reasonable trier of fact could conclude [she] has suffered objectively tangible harm”). In any event, Joy’s non-recommendation for a hypothetical position would not have dissuaded a reasonable employee from coming forward.
Fourth and fifth. Taylor’s supervisors twice lowered her performance evaluation — from “Outstanding” in 2001, to “Excellent” in 2002, and to “Fully Effective” in 2003. In order for a performance evaluation to be materially adverse, it must affect the employee’s “position, grade level, salary, or promotion opportunities.” See Baloch, 550 F.3d at 1199. Taylor’s bare, conclusory allegation that she was denied promotional and bonus opportunities “[a]s a result of PBGC’s unlawful conduct in violating Title VIPs prohibition against retaliation” does not discharge her burden to show the evaluations were “ed to financial harms.” Id.
Sixth. Taylor was temporarily listed as AWOL in the first or second week of November 2003. Although the PBGC ultimately rescinded the listing and gave Taylor her lost pay, the temporary deprivation of wages counts as a materially adverse action. See Greer v. Paulson, 505 F.3d 1306, 1317 (D.C.Cir.2007) (“diminution in pay or benefits can [be adverse] even when the employer later provides back pay”).
The Corporation offered a nondiseriminatory reason for the challenged action: The Human Resources Department directed Henkel to list Taylor as AWOL because the leave slip she submitted appeared to indicate Taylor had not obtained Henkel’s prior approval, as all auditors were required to do. After Taylor had returned to work and the confusion was eventually dispelled, the AWOL charge was rescinded and Taylor’s pay restored. We therefore move to the question of retaliation vel non, *1302 see Jones, 557 F.3d at 678, which in this instance reduces to whether a reasonable jury could find the Corporation’s “proffered explanation is unworthy of credence,” Tex. Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
Taylor rebuts the PBGC’s explanation by asserting she contacted Henkel regarding her request for annual leave before she left the leave slip in his in-box. Although Henkel denies having given Taylor oral approval, we assume a reasonable jury could credit Taylor’s account. Her account, however, does nothing to undermine the PBGC’s explanation because in her opposition to the motion for summary judgment she acknowledged she erred in completing the request form by “mistakenly checking] the ‘sick leave’ box” but entering the dates in the area for annual leave. Henkel therefore asked Human Resources for direction and merely implemented their decision.* Once the confusion, which Taylor herself had created, was cleared up, her record was corrected and her pay was restored. Therefore, no reasonable jury could infer the PBGC retaliated against Taylor when it treated her as having taken leave without permission. See Greer, 505 F.3d at 1319-20.
Taylor’s remaining arguments on this score are even further off the mark, but two do deserve mention. First, on appeal Taylor newly points out that the PBGC placed her on AWOL in November 2003, two and one-half months after she filed her first lawsuit; hence, she argues, “there is sufficient temporal proximity for a reasonable jury to find” the Corporation was retaliating against her.** On the contrary, an inference of retaliatory motive based upon the “mere proximity” in time between Taylor’s filing her first suit and the AWOL listing two and one-half months later would be untenable on the record here. See Woodruff v. Peters, 482 F.3d 521, 530 (D.C.Cir.2007) (“positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine”); Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C., 277 F.3d 882, 895 (7th Cir.2001) (rejecting argument that “two-month period between [protected activity] and [employee’s] discharge establishes a ‘causal connection’ between the two events” when employee had not pointed to other circumstances suggesting events were related); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (stating, “to establish a prima facie case ... the temporal proximity must be ‘very close,’ ” and citing with approval case holding three month interval is, as a matter of law, not close enough); Kipp v. Mo. Highway & Transp. Comm’n, 280 F.3d 893, 897 (8th Cir.2002) (holding employee failed to make out “causal link” required for prima facie case of retaliation because two months between protected activity and challenged action could not, as a matter of law, “justify a finding in [her] favor”).
Second, Taylor argues the jury could infer either Henkel or the Human Resources Department or both retaliated against her because on more than one occasion after she filed her EEO complaint Henkel criticized her work and yelled at *1303 her and because her coworkers somehow learned she had been listed as AWOL. These incidents do not amount to the “pattern of antagonism” required for a reasonable jury to infer Henkel, much less Human Resources, was retaliating against Taylor. Cf. Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997) (“plaintiff can establish a link between his or her protected behavior and [the alleged reprisal] if the employer engaged in a pattern of antagonism in the intervening period”). The petty slights she describes, which would not qualify as adverse actions, see Burlington Northern, 548 U.S. at 68, 126 S.Ct. 2405, likewise do not suffice to make out a case of retaliation, see id. (“Title VII ... does not set forth ‘a general civility code for the American workplace’ ” (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998))).* In sum, the PBGC was entitled to summary judgment because Taylor has not provided a reasonable jury any basis upon which to disbelieve the PBGC’s explanation of the AWOL incident.
III. Conclusion
For the foregoing reasons, the judgment of the district court is

Affirmed.

 The PBGC is a nonprofit corporation "established within the Department of Labor,” 29 U.S.C. § 1302(a), and the Secretary of Labor is the Chairman of its Board of Directors, id. § 1302(d).

 The dissent deems it "irrelevant” "[w]hether Taylor herself believed she was being sexually harassed,” Dissenting op. at 1327, and suggests the court is "placing a more stringent reporting requirement on a more sensitive plaintiff,” id. at 1327. A plaintiff who knows about her employer’s complaint procedure and fails to use it even as she tells a manager she is being harassed runs head long into the prophylactic rule announced in Faragher, which was not designed to protect sensitive employees, but rather to encourage all employees to "avoid[] harm” when doing so is possible, and to ensure a plaintiff is not "reward[ed] ... for what her own efforts could have avoided.” 524 U.S. at 806-07, 118 S.Ct. 2275.

 Roebuck, which involved repeated harassment by and a threat from the employee’s supervisor, is not to the contrary. See 408 F.3d at 791-92; Dissenting op. at 1324-25 (noting that employee in Roebuck "alleged her supervisor ... had sexually harassed her"). Bacon had no supervisory authority over Taylor. In Roebuck, moreover, the question was whether "fear and uncertainty made [the employee’s] delay in complaining reasonable” under the circumstances. 408 F.3d at 795. The dissent suggests Taylor may reasonably have been uncertain whether Bacon’s conduct violated the PBGC's policy because the policy “defined sexual harassment in objective terms.” Dissenting op. at 1326-27. Taylor, however, was not at all uncertain; she believed and told others she was being harassed. Nor could a reasonable jury find Taylor was uncertain about what the PBGC's policy required of her: As Taylor acknowledged in both her EEO complaint and an affidavit, in October 2001 she posted on her door a PBGC e-mail that stated "[i]f you believe that you are a victim or witness to workplace harassment, please report it immediately to an EEO Official or Counselor.”

 Retaliation claims based upon circumstantial evidence are governed by the three-step test of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which requires the employee first to establish prima facie the elements of retaliation. See Wiley v. Glassman, 511 F.3d 151, 155 (D.C.Cir.2007). If the plaintiff does so, then the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for its action. Id. If the employer does so, then the court "need not — and should not — decide - whether the plaintiff actually made out a prima facie case under McDonnell Douglas," Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C.Cir.2008) (disparate treatment claim); Jones v. Bernanke, 557 F.3d 670, 678 (D.C.Cir.2009) (retaliation claim); rather, the court should proceed to the question of retaliation vel non. The court can resolve that question in favor of the employer based either upon the employee’s failure to rebut its explanation or upon the employee’s failure to prove an element of her case — here that her employer took a materially adverse action against her.

 A circuit court is "justified in resolving an issue not passed on below ... where the proper resolution is beyond any doubt.” Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); see Jones, 557 F.3d at 676 ("we may affirm a judgment on any ground the record supports,” provided "the opposing party had a 'fair opportunity' to address” that ground). Taylor, who had the burden of proof, had such an opportunity *1301 and took it; she engaged in extensive discovery aimed at proving retaliation.

 Although, as the dissent notes (at n. 6), it appears from the face of the leave slip that Henkel first approved Taylor's request, he explained that as a matter of course he signed such slips when he received them. His change of position is consistent with the PBGC's explanation that Henkel, confused by Taylor’s error in completing the slip, requested guidance from Human Resources.

 Taylor offers this argument to show she made out a prima facie case but, because she wants this case remanded to the district court for a trial on the merits, we take her argument as equally applicable to the issue before us.

 Contrary to the suggestion that Taylor suffered retaliation by "a thousand cuts,” Dissenting op. at 1332, there is no such pattern of abuse here. The dissent merely assumes allegedly retaliatory acts were in fact retaliatory. Id. at 1329-30, 1332. Nor does the dissent explain how trivial actions on the part of Joy and Henkel could support a reasonable inference that the Human Resources Department acted with a retaliatory motive. Id. at 1332.