Shelley R. SLAUGHTER, M.D.,
Ph.D., Plaintiff,

v.

HOWARD UNIVERSITY,
et al., Defendants.

Civil Action No. 97–0323(JR).

United States District Court,
District of Columbia.

June 12, 1997.

Shelley D. Hayes, Washington, DC, for Plaintiff.

A. Scott Bolden, Bhavana S. Boggs, Reed Smith Shaw & McClay, Washington, DC, for Defendants.

## *MEMORANDUM*

ROBERTSON, District Judge.

In this action plaintiff alleges that defendants discriminated against her on the basis of national origin and gender when Howard University decided to not renew her employment as a medical officer and an assistant professor of obstetrics and gynecology.[1] Plaintiff moved for summary judgment in Superior Court just before defendants removed the case to this Court. Defendants responded with their own motion for sum-

---

1. Plaintiff originally brought claims under both Title VII and the D.C. Human Rights Act. The plaintiff filed an amended complaint after this case was removed from D.C. Superior Court that includes only the D.C. Human Rights Act claim. This Court exercises its supplemental jurisdiction over that claim.

mary judgment.[2] For the reasons explained below, defendants' motion for summary judgment will be granted, and plaintiff's motion will be denied.

## Facts

. Plaintiff is an African–American female. She signed a one-year employment contract with Howard University on May 17, 1993. She was given the "immediate task" of developing a Division of Reproductive Endocrinology and Infertility at Howard University Hospital. Plaintiff was also expected to "incorporate this body of knowledge into the undergraduate and postgraduate curricula" at Howard University. Complaint Ex. A. Plaintiff was to receive a $100,000 annual base salary and a $100,000 clinical practice supplement through the Faculty Practice Plan beginning July 1, 1993.[3]

In late June 1994, the Accreditation Council for Graduate Medical Education withdrew Howard University Hospital's accreditation for the Department of Obstetrics and Gynecology. On July 1, 1994, defendant Dr. Newton Osborne, a Panamanian-born male, became chairman of the department. Dr. Osborne appointed Dr. Richard Blake to head a subgroup in the area of reproductive endocrinology. Dr. Blake had been a member of the faculty at the College of Medicine since the early 1980s and was certified in the sub-specialty of reproductive endocrinology and infertility.[4] At one time he had been accorded tenure, although he took part-time status in 1989. Howard University Hospital received "provisional accreditation" for its residency program in obstetrics and gynecology in May 1996. On June 26, 1996, Dr. Osborne notified Dr. Slaughter that her annual contract would not be renewed at the end of June 1997. Complaint Ex. E. The notification letter gave no specific explanation for the non-renewal and included positive statements about plaintiff's contribution, to Howard University as a teacher. Five part-time faculty members—all men—received notices of non-renewal at or near the same time. Dr. Slaughter was the only full-time faculty member to receive a notice of non-renewal.

Dr. Osborne states in an affidavit that his decision not to renew plaintiff's employment contract was based on Dr. Slaughter's "lack of productivity"; that Dr. Blake, in his part-time position, could handle the patients with concerns relating to reproductive endocrinology and infertility; and that Dr. Slaughter's teaching responsibilities could be handled by other members of the department. Def. Mot. at Ex. 1 (Osborne Affidavit ¶ 13). Dr. Osborne states that the duties performed by Dr. Slaughter did not justify her retention beyond the term of her contract. *Id.*

Plaintiff's submission is that she was treated differently in her employment on the basis of her gender (female) and/or her national origin (American-born). She alleges specifically that she was required to perform general obstetrics services as part of her practice, that she was given no support in her attempts to develop a training program in reproductive endocrinology and infertility, and that she was wrongly terminated.

## Analysis

■ A *prima facie* case of disparate treatment on these facts requires that a "similarly situated" unprotected employee be identified as a comparator. Plaintiff offers Dr. Blake as the comparator. Pl. Opp. to the Mot. for Summ. J. at 2 ("Plaintiff has satisfied her *prima facie* burden of demonstrating that she was qualified for the academic position for which she received a notice of non-renewal while Dr. Blake, a foreign-born male, has been retained by the institution."); Pl. Statement of Facts in Opp. to Mot. for Summ. J. at ¶ 6 ("The only comparison to be drawn in this case is between Defendants' treatment of Plaintiff and his treatment of Dr. Blake.").

---

2. Defendants moved to dismiss the claims as to defendants Dr. Floyd J. Malveaux and Dr. Newton G. Osborne. The rulings on the cross-motions for summary judgment make it unnecessary to rule on the motion to dismiss.

3. Since 1995, plaintiff's annual contract has included only the base salary of $100,000 and not the practice supplement. Complaint Ex. C.

4. Dr. Slaughter received her certification in the sub-specialty of reproductive endocrinology and infertility in March 1996.

In taking this approach, plaintiff focuses exclusively on her termination claim.[5]

## A. National Origin

 Defendant states, and plaintiff concedes, that Dr. Blake was born in the Canal Zone of Panama (which is a territory of the United States) to American parents and that he has always been a United States citizen. Despite these undisputed facts, plaintiff persists in her argument that defendant's "foreign-born" status can be used to establish a *prima facie* case of national origin discrimination.

 Plaintiff does not allege or show that American-born persons are in the minority at Howard University Hospital or in the College of Medicine, and plaintiff's claim is therefore one of "reverse discrimination." To prove a *prima facie* case of reverse discrimination, plaintiff must meet a heightened level of scrutiny. *Parker v. Baltimore and Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir. 1981). Most importantly, plaintiff must provide evidence of background circumstances that could lead a fact finder to infer discriminatory motive based on national origin. *Id.* Because no such evidence has been presented by plaintiff or identified in the record,[6] the national origin claim must be dismissed.

## B. Gender

 Plaintiff argues that a *prima facie* case of gender discrimination exists because plaintiff, a female, was terminated from her employment, while Dr. Blake, a similarly situated male, was retained and will take over some of her job responsibilities. Resolution of the motion for summary judgment depends on whether Dr. Blake was similarly situated to plaintiff.

The District of Columbia Circuit has adopted the standard set forth in *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994): a plaintiff is "similarly situated" to a comparator if "all relevant aspects of [plaintiff's] employment situation were nearly identical' to those of [the comparator's] employment situation." The D.C. Circuit, in *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507 (1995), suggests how that standard should be applied in this case. In *Neuren*, the court ruled that a female plaintiff alleging employment discrimination had failed to establish at trial that a male colleague was similarly situated because: 1) plaintiff presented little credible evidence that her male colleague—unlike plaintiff—did not get along with others in the firm; 2) the male was more junior so there was less pressure to make a partnership decision about him; and 3) the evidence showed that plaintiff and her male colleague had different deficiencies in their work. *Id.* at 1514.

In this case, the undisputed facts establish at least the following differences between plaintiff's situation and that of Dr. Blake: 1) Dr. Blake has been employed by the University since the early 1980s whereas plaintiff was hired in 1993; 2) Dr. Blake was certified in reproductive endocrinology and infertility when he was appointed head of the reproductive endocrinology group, while plaintiff did not receive her certification until March 1996; 3) plaintiff was hired as an assistant professor, whereas Dr. Blake held an appointment at the higher level of associate professor; and 4) Dr. Blake was a part-time member of the faculty, while plaintiff was a full-time member of the faculty. On those undisputed facts, plaintiff cannot establish that she was similarly situated to Dr. Blake. *See Javetz v. Brd. of Control*, 903 F.Supp.

---

5. Plaintiff has not even attempted to establish a *prima facie* case of discrimination as to any claim other than the claim of discriminatory termination. Plaintiff has identified no specific comparators with respect to her allegations that she was unfairly required to perform general obstetrics services or that she was not given sufficient support for her efforts to develop a training program in reproductive endocrinology. Although she has submitted work schedules from 1995 and 1996 suggesting that she was on call to provide obstetrical and gynecological services more often than some other doctors (whose gender and national origin were provided), plaintiff does not allege in her amended complaint or argue in her opposition to defendant's motion that those other doctors were similarly situated.

6. Plaintiff alleges that six of thirteen full-time faculty members are foreign-born. That fact alone, however, raises no presumption of discrimination.

1181, 1189 (W.D.Mich.1995) (plaintiff could not compare self to colleague who had several years of post-doctoral teaching experience at the time of the hire and received more favorable student and peer evaluations)

Plaintiff's claim of gender discrimination must be dismissed because she has not shown, and on the undisputed facts cannot show, that she was accorded treatment different from that of a similarly situated unprotected person.

An appropriate order accompanies this memorandum.

### ORDER

Upon consideration of the cross-motions for summary judgment, the oppositions and the replies, it is this 12th day of June

**ORDERED** that defendants' motion for summary judgment [# 3] is **granted.** It is

**FURTHER ORDERED** that plaintiff's motion for summary judgment (originally filed in Superior Court and referenced in this Court's March 10, 1997 order) is **denied.** It is

**FURTHER ORDERED** that this case is **dismissed.**