**Lataunya HOWARD, Plaintiff,**

v.

**OFFICE OF the CHIEF ADMINISTRATIVE OFFICER OF the UNITED STATES HOUSE OF REPRESENTATIVES, Defendant.**

**Civil Action No. 09–1750**

United States District Court, District of Columbia.

Signed 08/04/2015

Ross Andrew Nabatoff, Law Office of Ross A. Nabatoff, Washington, DC, for Plaintiff.

Jeremy S. Simon, Peter C. Pfaffenroth, U.S. Attorney'S Office, Kerry William Kircher, William Bullock Pittard, IV, Kaiser Dillon, PLLC, Eleni Maria Roumel, Isaac Benjamin Rosenberg, Todd Barry Tatelman, U.S. House of Representatives, Office of General Counsel, Washington, DC, for Defendant.

## MEMORANDUM ORDER GRANTING SUMMARY JUDGMENT

UNITED STATES DISTRICT JUDGE BARBARA J. ROTHSTEIN

Defendant Office of the Chief Administrative Officer of the United States House of Representatives (hereinafter, "CAO") brings this motion for summary judgment, seeking dismissal of Plaintiff Lataunya Howard's racial discrimination and retaliation claims brought pursuant to 2 U.S.C. § 1311 and 2 U.S.C. § 1317, respectively. (Doc. No. 73). After reviewing the briefs and all other relevant material properly before the Court, the Court will GRANT the motion for summary judgment.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate under Fed. R. Civ. P. 56(c)(2) where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The facts and all inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a moving party produces evidence establishing the lack of a genuine issue of material fact, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* The mere existence of "a scintilla of evidence" in support of a plaintiff's position is not sufficient to create a genuine issue of material fact. *Id. See also Boykin v. Gray*, 986 F.Supp.2d 14, 17

(D.D.C. 2013) ("The non-moving party's opposition ... must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing there is a genuine issue for trial.").

## BACKGROUND

On April 15, 2003, Plaintiff Lataunya Howard, an African American female, was hired by the CAO as a Deputy Budget Director.[1] Howard was employed on an at-will basis. (Doc. No. 73, Ex. I, Howard Dep. at 10–11). Throughout the course of her employment, Howard's salary was determined by a House Employees Schedule, which classified each employee by level and step. The employee's level and step is determined by reference to the employee's job duties, qualifications, experience, and longevity in the organization. (Doc. No. 73, Hite Decl. at para. 7). Upon hire, Howard was classified as a level 11, step 4 employee; she earned $83,544 annually. (Doc. No. 73 at 4).

During the three years she worked as a Deputy Budget Director, Howard consistently received high performance reviews. (Doc. No. 1, Compl. at para. 8). In 2006, Howard was promoted to Budget Director. (Doc. No. 73, Howard Dep. at 11–13). For much of the time she served as Budget Director, Howard worked under Ali Qureshi, Deputy Chief Administrative Officer for Operations, who in turn worked under Daniel Beard, Chief Administrative Officer of the House.

### A. Howard's Transfer

According to the CAO, around January 2009 Beard decided that the Budget Department as well as the Budget Director position should be eliminated. (Doc. No. 73,

Beard Aff. at para. 11). Qureshi asserts that he recommended that Beard move Howard, contemporaneously with the transfer, to a Senior Advisor position after the Budget Department was dissolved. (Doc. No. 73, Qureshi Decl. at para. 9). According to Qureshi, he recommended the Senior Advisor position for Howard because she had poor managerial capabilities. (*Id.* at paras. 7–10). Qureshi stated that these concerns about her managerial abilities were predicated, in part, on a "2008" "management effectiveness survey" generated by Howard's subordinates. (*Id.*).

Howard received a mean score of 2.58 out of 5 on this survey. (Doc. No. 73, Hite Decl., Ex. 1). In the qualitative section of the open-ended portion of the survey, her subordinates indicated that Howard: "alienated some people with her brusque manner and edgy attitude; "created a disgruntled atmosphere;" "berate[d] an employee for asking a work-related question;" and "ma[d]e obscene gestures in the workplace to show her displeasure or just for shock value" (*Id.*).

Later that January, Beard moved Howard to a Senior Advisor position. According to Beard, he transferred Howard based on Qureshi's recommendations as well as his own reasons:

First, Ms. Howard lacked the interpersonal skills to be an effective manager. Second, she had analytical skills that were useful to the Office of the CAO. Third, and most importantly, Ms. Howard made it difficult for me to effectively support the legislative activities of the Committees on Appropriations and House Administration by not sharing information with other employees ..., by not listening to other employees ..., and by communicating to the Committee on Appropriations and others informa-

1. Where disputed, the Court sets forth the facts in the light most favorable to Howard.

tion that reflected her own budgetary preferences rather than the views of the CAO.

(Doc. No. 73, Beard Aff. at para. 13). According to Beard, he then dissolved the Budget Department and transferred its responsibilities to another section. (*Id.*).[2]

Beard transferred two Caucasian male employees to the Senior Advisor position as well: Steen Hambric (formerly the Assistant Chief Administrator Officer for House Information Resources); and Norman Farley (formerly a director in House Information Resources). The transfer represented a significant decrease in managerial responsibility for both men. (*See* Qureshi Dep. at 80–91; Beard Aff. at para 11). However, Hambric and Farley, like Howard, each remained at the same level and step and maintained the same salary they received pre-transfer.[3]

After Howard was transferred, she decided to delete from her computer a software program known as OakTree. OakTree is utilized primarily in the creation of the "AE4 file." The "AE4 file" is an Excel spreadsheet used to "calculate the House's actual year-to-date expenditures for FICA, Medicare, and each personnel benefit, and to project the House's expected year-end expenditures for FICA, Medicare, and each personnel benefit." (*See* Howard Dep. at 59–62; Abbott Dep. at 61). As Budget Director, Howard had overseen and worked on the "AE4 file" several times over the last two years. It is uncontested that Howard was not instructed to delete OakTree.

**B. Howard's Termination**

On February 13, 2009, Qureshi directed Howard to set up and update the "AE4 file." (Qureshi Decl., Ex. 1 at 3–4 (Feb. 13, 2009 Qureshi email to Howard) ("I need your assistance on a budget related item. Could you please work with Elizabeth Nuti to set up the projection file for the Government contributions account as it needs to be updated it [sic] for the actual data through January?")). This process required: (1) creating a new "AE4 file;" (2) using the OakTree program to download year-to-date data; (3) validating any irregularities in the data; and (4) ensuring that "pivot tables" or summaries of the data are refreshed in the spreadsheet to reflect the updated data. (Doc. No. 73 at 9–10). Howard estimates that this task would have taken less than two hours to complete. (Qureshi Decl., Ex. 2 at 2 (Howard's email to Qureshi)).

Upon receiving the assignment, Howard emailed Nuti, a Caucasian co-worker, twice to "offer assistance" to Nuti as Nuti completed the assignment. (Qureshi Decl. Ex. 1, at 3 (Howard's email to Qureshi)). Nuti refused to do the assignment, arguing that Howard was supposed to do it by herself. (*Id.*).

On February 17, 2009, Howard emailed Qureshi to inform him that she believed the assignment had not been given to her. (Qureshi Decl., Ex. 1 at 2 (Feb. 17, 2009 Howard's email to Nuti and Qureshi)). Rather, according to Howard, the task was primarily assigned to one of two Caucasian employees—either Elizabeth Nuti or Jessica Abbott; Howard thought her assign-

---

**2.** Howard asserts that there is a dispute of fact as to whether the Budget Department was abolished. However, the only evidence she musters in support of this assertion is exceedingly threadbare: A "Budget Department" contact list was still in existence.

**3.** Hambric, who had been at the CAO since 1999, continued earning his annual salary of $163,795; Farley, an employee since 2000, continued earning his annual salary of $168,411; and Howard, an employee since around 2003, continued earning her annual salary of $146,004. (Doc. No. 73 at 8).

ment only involved providing guidance. (*Id.*). Qureshi responded that Howard should update the "AE4 file" by herself. (Qureshi Decl., Ex. 1 at 2 (Feb. 17, 2009 Qureshi email to Howard)("In the spirit of teamwork and time sensitivity could you please set up and download the file? Your extensive knowledge of budget matters is the reason I asked Elizabeth to reach out to you. Thanks in advance for stepping in and helping.").

In response, Howard indicated that she now understood that she was tasked with setting up the "AE4 file" alone. (*Id.* at 1–2 (Feb. 17, 2009 Howard's email to Qureshi) ("I didn't learn until Friday afternoon [February 13, 2009] that I was expected to set up the file, versus help Elizabeth set up the file ....")). Howard maintained, however, that Nuti or Abbott should be assigned the task instead. (*Id.* (Feb. 17, 2009 Howard email to Qureshi) ("I believe that Jessica is in so perhaps she is available to begin setting up the file if needed.")). Howard did not want to do the assignment because she was "not comfortable with being solely responsible for setting up" the file as "she was no longer in Budget." (*Id.* (Feb. 17, 2009 Howard email to Qureshi)).[4]

Qureshi responded to this email on February 25, 2009. He reiterated that Howard needed to set up and update the "AE4 file." (Qureshi Decl., Ex. 1 at 1 (Feb. 25, 2009 Qureshi email to Howard) ("My recommendation [for Howard to set up the file] is because both [Nuti and Abbott] have limited bandwidth at the current time so your assistance will be timely and very much appreciated.")). Qureshi also told Howard that she was the right person for the assignment because she had more time than either Nuti or Abbott. He then directed Howard to "schedule time with [Nuti and Abbott] to walk them through" how

Howard had set up and updated the "AE4 file." (*Id.*). Howard requested to hold a meeting with Qureshi regarding the assignment. (*Id.* (Feb. 25, 2009 Howard email to Qureshi)). Qureshi denied her request, stating that his "request [was] pretty straightforward." (*Id.* (Feb. 25, 2009 Qureshi email to Howard)).

On March 2, 2009, Howard sent a "follow-up" email to Qureshi, objecting to the assignment. She stated that assigning the task to Nuti instead of Howard would "minimize the amount of time that [Howard] will be unavailable or unable to handle the responsibilities of [her] own position." (Qureshi Decl., Ex. 2 at 4 (Mar. 2, 2009 Howard email to Qureshi)). Qureshi did not respond to this email.

On March 10, 2009, Howard asked Qureshi to update her on the status of the "AE4 file" and inform her if Qureshi still needed Howard to "provide guidance" on the assignment. (*Id.* at 3–4 (Mar. 10, 2009 Howard email to Qureshi)). Qureshi responded: "I am disappointed that we have spent more time discussing the effort than actually getting started on it." (*Id.* at 4 (Mar. 10, 2009 Qureshi email to Howard)). Qureshi then directed Howard, again, to handle the task by herself, setting a firm deadline of March 20, 2009 for completion. (*Id.*) ("I specifically asked you to set up the file and then follow up to walk [Nuti and Abbott] through it. The basis for this approach was that they had limited bandwidth ... Therefore, I am requesting you to please complete this task by COB Friday, 3/20/90 and then reach out to [Nuti and Abbott] to walk them through it.").

On March 12, 2009, Howard emailed Qureshi, complaining that her "role in the request somehow shifted from providing consultative guidance ... to becoming

---

4. Neither Nuti nor Abbott was in the now dissolved Budget Department.

wholly accountable for completing the task." (Qureshi Decl., Ex. 2 at 1–2 (Mar. 12, 2009 Howard email to Qureshi)). Howard indicated that, had Abbott or Nuti followed the steps Howard emailed them, the task would have been completed in "less than 2 hours." (*Id.*). Howard further asserted that there are "some potential control issues" with her doing the assignment. (*Id.*). She did not explain the nature or extent of the "control issues." Howard also cited concerns about the "fairness" and "reasonableness" of the assignment and requested to have a meeting about the issue. (*Id.*).

On March 19, 2009, Howard met with Director of Human Resources Jason Hite. She informed Hite that she would not meet the March 20, 2009 deadline for three reasons: she was no longer in a "budget function;" she did not "understand why someone in the budget function could not do her work;" and she had "internal control" issues. (Hite Decl. Ex. 7). Howard also complained that her Senior Advisor salary was not high enough. (*Id.*).

On March 20, 2009, Qureshi directed Howard to "please proceed with setting up the file as requested and then follow up with [Nuti and Abbott] to close the loop." (Qureshi Decl., Ex. 2 at 1 (March 20, 2009 Qureshi email to Howard)). He extended the deadline for completion to March 23, 2009. (*Id.*). Howard responded that she preferred to "discuss the issue first" as she had "internal control" issues. (*Id.* (March 20, 2009 Howard email to Qureshi)). According to Howard, she felt that it was inappropriate for her, as a "non-Budget" employee, to handle any of the financial or budgetary data. (*Id.*). Howard stated that she could "meet with [Nuti and Abbott] when schedules permit to provide any needed guidance, per [Qureshi's] previous request." (*Id.* (Mar. 20, 2009 Howard email to Qureshi)).

On March 23, 2009, Howard informed Qureshi that she planned to have her "access to the AFS/Budget shared drive removed because [she] no longer [was] in the division/department." (Qureshi Decl., Ex. 3 at 1 (Mar. 23 Howard email to Qureshi)). While the "AE4 file" was maintained on this shared drive, Howard assured Qureshi that "any information [she] m[ight] need c[ould] be handled via email, as with other divisions/departments." (*Id.*). Qureshi approved Howard's request.

On March 26, 2009, Howard met with Qureshi. Howard informed Qureshi that she could not finish the assignment because she "did not have access to the necessary files." (Howard Dep., Ex. I at 79–80, 99.) According to Howard, she did not have the tools—presumably Oak-Tree—needed to download data and was no longer a member of the Budget Department. (Howard Dep., Ex. I at 84). Qureshi disagreed that any of these issues were legitimate obstacles to completion.

On March 27, 2009, Qureshi reiterated to Howard that her assignment was to set up and update the "AE4 file" and then meet with Nuti and Abbott after completion. (Qureshi Decl., Ex. 4 at 1–2 (Mar. 27, 2009 Qureshi email to Howard)). Qureshi stated that, while he did not accept Howard's concerns as a valid excuse for not completing the assignment, he would ask Nuti to put the "AE4 file" on an area of the network that Howard could access. (*Id.*). Qureshi also extended the deadline for completion, yet again, to April 3, 2009. (*Id.*).

On March 30, 2009, Howard told Qureshi that she "still didn't know what [Nuti and Abbott] were unable to do or figure out about the file." (Qureshi Decl., Ex. 4 at 1 (Mar. 30, 2009 Howard email to Qureshi)). Howard asserted that she told Nuti that she did not have access to OakTree and offered to meet with Nuti and Abbott

about any questions they may have in completing the task. Howard further proclaimed that, even if the file were on the right drive, she should not access it because there were potential "internal control issues" with her accessing the data. (Howard Dep. at 85–86). She also stated that the responsibility for the "AE4 file" belonged to other employees and that the assignment distracted from her duties. (Qureshi Decl., Ex. 4 at 1 (Mar. 30, 2009 Howard email to Qureshi)).

On March 31, 2009, Nuti posted the "AE4 file" on a "shared" drive; that is, one to which Howard had access. (Qureshi Decl., Ex. 5 at 2–3 (Mar. 31, 2009 Nuti email to Howard and Qureshi, copying Abbott)). Nuti also added certain additional information, which Howard might need if she did not have access to OakTree. (Id.). After scanning the file, Howard told Qureshi that the "AE4 file" assignment had not been completed. (Id. at 2 (Apr. 1, 2009 Howard email to Qureshi)). She then provided a bullet point list of the remaining work that needed to be done on the "AE4 file." (Id.).

On April 2, 2009, Qureshi informed Howard that, as a Senior Advisor, she was expected to complete certain additional special projects that fell outside of her "strategic work." (Qureshi Decl., Ex. 5 at 1 (Apr. 2, 2009 Qureshi email to Howard)). He further clarified that he had expected Howard to perform the "AE4 file" assignment on her own and then share her knowledge with Nuti and Abbott. (Id.). Assuring Howard that he had considered her concerns about her workload, internal controls, and access to data, he extended the deadline to April 3. (Id.). He directed Howard to complete all the tasks that she had listed in her bullet point list and warned her that "failure to [finish] will leave me with no other option but to take appropriate disciplinary action." (Id.).

On April 7, 2009, Qureshi asked Howard whether she had been able to complete the bullet points by April 3, 2009. (Qureshi Decl., Ex. 6 at 1 (Apr. 7, 2009 Qureshi email to Howard)). On April 8, 2009, Howard responded: "Unfortunately, I have not, for the reasons and concerns we have discussed." (Id. (Apr. 8, 2009 Howard email to Qureshi)). Upon receiving this email, Qureshi prepared a memorandum that same day to file with Beard stating his decision to fire Howard for "[h]er repeated, deliberate failure to comply with my express directive to complete a project [to set up the "AE4" file] assigned to her on February 13, 2009." (Doc. No. 73, at para. 57). After receiving Beard's approval, Qureshi fired Howard on April 14, 2009. (Doc. No. 73, Beard Aff. at para. 14).

### c. Procedural Background

Howard filed the present action on September 15, 2009, alleging that she was: (1) transferred because of her race; (2) underpaid because of her race; (3) terminated because of her race; and (4) terminated in retaliation raising certain complaints during the meeting with Hite.

In June 2011, this Court dismissed Howard's termination claims on the grounds that they were barred by the Speech or Debate Clause. See U.S. Const. art. I, sect. 6 cl. 1; see Howard v. Office of the CAO, 793 F.Supp.2d 294 (D.D.C. 2011) ("The Speech or Debate Clause operates as a jurisdictional bar when the actions upon which [a plaintiff seeks] to predicate liability [are] legislative actions."). The D.C. Circuit reversed this decision, holding that Howard may pursue her claim so long as she "does not contest her employer's conduct of protected legislative activities and that she prove[s] her allegations of pretext using evidence that does not implicate protected legislative matters." Howard v. Office of the CAO, 720 F.3d 939, 950 (D.C.

Cir. 2013). In other words, Howard may not inquire into legislative acts or the motivation for the legislative acts.

Specifically, with respect to the transfer claim, the D.C. Circuit held that Howard is "barred by the Speech or Debate Clause from disputing the accuracy of the [CAO's] assertion that she advanced her own budgetary views rather than those of the CAO." *Id.* at 942. Accordingly, Howard may claim only that this justification for transfer did not motivate her alleged demotion, i.e. that it was pretext for a discriminatory motive.

With respect to the retaliatory and discriminatory termination claims, the D.C. Circuit held that Howard:

> has not raised any issue about [her Senior Advisor] duties, nor does she propose to probe any aspect of the Account assignment or the motives giving rise to the assignment. Rather, Ms. Howard claims that she was assigned to perform a job and then denied the necessary resources and support to complete the work.

*Howard*, 720 F.3d at 952.

## DISCRIMINATION CLAIMS

### A. Legal Standard for Discrimination Claims Under 2 U.S.C. § 1311

■ As an employee of the House of Representatives, Howard must bring her discrimination claim under 2 U.S.C. § 1311. This statute incorporates, with certain limitations not relevant here, the provisions of Title VII. *See id.* ("All personnel actions affecting covered employees shall be made free from discrimination ... within in the meaning of Section 703 of the Civil Rights Act of 1964[.]"). Accordingly, the Court's analysis will track Title VII's "familiar burden-shifting framework establish[ed] by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996). Under this framework, the burden is first on a plaintiff to establish a prima facie case of discrimination by demonstrating that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999) (citing *McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C. Cir. 1984)).

■ If the plaintiff carries her burden, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for" its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal citations and quotes omitted).

■ If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the presumption raised by the prima facie case is rebutted and drops from the case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal citation omitted). Upon such a showing by the defendant, the district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (2008). In other words, did the plaintiff "show *both* that the reason was false, *and* that ... discrimination was the real reason." *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007) (alterations in original and internal quotations omitted) (quoting *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742).

The court must consider whether the jury could "infer discrimination from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory or that the non-[retaliatory] justification was pretextual." *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (quoting *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)). The court should assess the plaintiff's challenge to the employer's explanation in light of the totality of the circumstances of the case. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc).

■ Of course, a non-moving party's burden of "showing" at the summary judgment stage is satisfied if she establishes a genuine dispute of material fact. FRCP 56. Still, in order to satisfy this burden she must provide specific citations to the record; mere suppositions in the briefs are insufficient. *See Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)("An opposition to a motion for summary judgment must point to genuine issues of material fact supported by competent evidence beyond mere supposition.").

Howard is an African–American and thus a member of a protected class. She alleges she suffered two adverse actions: transfer and termination.

### B. Transfer

#### i. *Howard Cannot Establish a Prima Facie Case of Discrimination*

■ The CAO asserts that Howard cannot establish a prima facie case with respect to her transfer from Budget Director to Senior Advisor because the transfer was not an adverse employment action.

An "adverse employment action" under Title VII is a material change in the "terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." 42 U.S.C. § 2000e–2(a)(1); *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). According to Howard, the transfer was adverse because she lost her managerial responsibilities. The CAO counters that the transfer was not adverse because it merely represented a shift in Howard's responsibilities from a managerial capacity to a technical skill capacity. The Court agrees with the CAO. A slight change in responsibilities alone does not constitute an adverse employment action. *See Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006); *King v. Georgetown Univ. Hosp.*, 9 F.Supp.2d 4, 7 (D.D.C. 1998). Moreover, the record demonstrates that Howard's pay remained the same after the transfer.[5]

■ The CAO also argues that Howard has failed to demonstrate an inference of discrimination because there is no evidence that a "similarly situated" non-minority employee was treated more favorably. In the absence of direct evidence of discrimination, a plaintiff must identify a "similarly situated" comparator. *See Slaughter v. Howard Univ.*, 971 F.Supp. 613, 614 (D.D.C. 1997). Here, Howard has provided no evidence that a non-minority received her position. In fact, her position as Budget Director along with the Budget Department was terminated entirely. Since she cannot establish a prima facie case, her transfer claim fails.

#### ii. *Howard Cannot Establish Pretext*

■ The CAO further asserts that, even assuming Howard established a pri-

---

**5.** Howard also argues, somewhat paradoxically, that her transfer was a demotion because her pay did not change, i.e. the terms and conditions of employment remained the same. This argument clearly fails.

ma facie case of discrimination, she cannot show the CAO's justification for her transfer was pretext for a retaliatory motive. *Texas Dept. of Cmty. v. Burdine*, 450 U.S. 248, 250, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The CAO puts forward three reasons for transferring Howard: (1) she communicated her personal views on budget matters when speaking with the House Committees and not the views of her office; (2) she possessed "useful" analytical skills; and (3) she had poor management skills.

■■■ According to Howard, a reasonable juror could find that the CAO's explanations for her transfer are pretext for racial discrimination because the CAO did not record these justifications at the time of transfer. This argument fails. A lack of contemporaneous documentation explaining why the adverse employment action occurred does not, on its own, create a genuine issue of material fact. *See Jackson v. Gonzales*, 496 F.3d 703, 709–10 (D.C. Cir. 2007) (noting "Title VII has never been understood to impose" a requirement on employers of publishing a statement of reasons every time they make an employment decision). Since Howard does not allege that any contradictory documents were lost or destroyed, the CAO's failure to promptly document its justifications is of no moment.[6]

Howard further asserts the CAO's explanation for her transfer is pretext because the rationales for her transfer conflict. According to Howard, the CAO's current explanation for the transfer contradicts Beard's affidavit on the grounds that Beard's affidavit did not mention that he also relied upon Qureshi's recommendation in making his decision. Clearly, this minor omission is insufficient to create a general issue of material fact as to whether the CAO's legitimate, non-discriminatory reasons for the transfer are pretext. *See Hairston v. Vance–Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) ("Providing more detailed information once litigation begins does not create a genuine issue of material fact."); *Crockett v. Abraham*, 284 F.3d 131, 134 (D.C. Cir. 2002) (holding differences between defendant's most recent statement and her deposition do not create a genuine issue of material fact because her most recent statement is simply an augmentation of her initial deposition).

Howard also argues that her disparate treatment from the other two Caucasian Senior Advisors is evidence of pretext. According to Howard, both Caucasians received a higher salary and had some managerial responsibilities. (Doc. No. 76).[7] The CAO counters that any difference is immaterial because the two Caucasian males are inappropriate comparators: Both men were more senior than Howard and, therefore, were at a higher corresponding level and step on the payment scheme and merely continued at their pre-existing levels. *See Segar v. Smith*, 738 F.2d 1249, 1274 (D.C. Cir. 1984) (evidence must eliminate the most common nondiscriminatory explanations of the disparity).[8] The Court

---

6. Here, a mere lack of documentation is in clear contrast to other cases finding a genuine issue of material fact. *See, e.g., Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012) (holding the absence of documentation coupled with missing page of interview notes creates a genuine issue of material fact especially when the employer requires such documentation).

7. Howard also asserts that a reasonable juror could find pretext based on the fact that no other directors were transferred. However, she fails to cite to any specific directors with respect to which she is similarly situated.

8. Howard also appears to invoke this disparate pay argument as its own cause of action. In particular, she argues the CAO discriminated against her by paying her less and giving her less managerial responsibilities than

agrees. Since Howard has failed to demonstrate any dispute of fact regarding pretext, her transfer claim fails.

### C. Termination

#### i. Howard Cannot Establish a Prima Facie Case of Discrimination

 The CAO asserts that Howard has failed to establish a prima face case of racial discrimination with respect to her subsequent termination. Unquestionably, termination is an adverse action. Therefore, Howard need only show that the termination action creates an inference of discrimination. *See Stella v. Mineta*, 284 F.3d 135, 145 (D.D.C. 2002).

Howard asserts that her termination raises an inference of discrimination because the assignment was ·given to her and Nuti—a Caucasian—to complete together; however, only Howard was punished for refusing to complete the project. This contention is contrary to the record. Her correspondence with Qureshi makes it painstakingly clear that the project was assigned to Howard to complete. On February 17, 2009, Howard indicated that she understood the assignment was given just to her. (Qureshi Decl., Ex. 1 at 2 (Feb. 17, 2009 Howard's email to Qureshi) ("I didn't learn until Friday afternoon [February 13, 2009] that I was expected to set up the file, versus help Elizabeth set up the file ....")).

 Moreover, even if Nuti had been given the assignment, any difference in treatment is immaterial because Nuti is not an appropriate comparator. In order to state a prima facie case based on comparator evidence, the plaintiff must establish that she and a similarly situated person

were treated differently. *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999). An individual is similarly situated if she and the plaintiff are alike in all relevant aspects. *Id.* The record shows that Nuti and Howard had different supervisors, titles, and job responsibilities and, therefore, are not similarly situated. Moreover, it appears that Howard has now conceded that Nuti is not an appropriate comparator. *See* Doc. No. 85 at 4 ("Howard never contended that Ms. Nuti was a comparator."). Accordingly, she cannot establish a prima facie case of discrimination.

#### ii. Howard Cannot Establish Pretext

 The CAO further argues that, even if Howard had established a prima facie case, her claim fails because she cannot demonstrate pretext.

According to the CAO, it fired Howard because she was insubordinate, i.e. refused to work on the assignment. *See, e.g., Adair v. Solis*, 473 Fed.Appx. 1, 2 (D.C. Cir. 2012) (holding insubordination as a legitimate, non-discriminatory reason for terminating an employee). Howard counters that a reasonable juror could reject this justification as pretext because the CAO and its employees prevented Howard from completing the assignment. According to Howard, there is a genuine dispute of fact as to whether the CAO set her up to fail by refusing to supply her with the proper tools and, therefore, did not honestly believe that she was insubordinate.

Howard presented this argument on appeal to the D.C. Circuit in the context of a motion to dismiss. The Circuit found this argument persuasive in that context and commented that Howard is entitled to pursue search for evidence in support of this

---

two Caucasian males who had also been transferred into the Senior Advisor position salary. However, the two Caucasian employees' higher pay grade due to being employed

several years more than Howard reinforces the fact that they are inappropriate comparisons; Howard's disparate treatment claim (if indeed she is making one) has no support.

assertion. However, the record Howard has presented to this Court does not support the assertions she made to the Circuit.

First, Howard seemingly asserts that Qureshi prevented her from completing the assignment by denying her access to certain programs and files, namely Oak-Tree and the budget drive. However, Howard's citations to the record are conspicuously silent on this point; she provides no evidence suggesting that she was denied access to any requested resources or that any employee attempted to bar her from completing the assignment. In fact, the record now before the Court paints the exact opposite picture. Howard specifically requested to have the OakTree program and the budget drive—two necessary files—removed from her computer. (Qureshi Decl., Ex. 3 at 1 (Mar. 23 Howard email to Qureshi)).[9] Yet, even though Howard knew she did not have the necessary resources, she did not inform Qureshi about this problem until nearly a month after receiving the assignment. Far from denying her access, Qureshi directed Nuti to provide Howard with the requested access and even extended the deadline for completion.[10] Notwithstanding this additional time and assistance, Howard still failed to complete the assignment.

Howard also asserts that Nuti and Abbott were uncooperative and caused her to fail. According to Howard, she made "repeated requests for assistance" but Nuti and Abbott refused to help her in completing the task. Doc. No. 83 at 25. In support of this argument, she cites to "SOMF, Attachment 16." *Id.* However, the sixteenth attachment in this docket entry is a deposition from Qureshi. Howard does not cite to any specific line, paragraph, or page in this deposition. Notwithstanding this lack of proper citation, the Court, on its own, reviewed this deposition and the entire record, and finds nothing to suggest that Howard asked for assistance or that Nuti and Abbott refused Howard's requests for help. Rather than demonstrating that any CAO employee frustrated her efforts to complete the assignment, the record before the Court shows only that Howard offered to "assist" Nuti and Abbott in completing an assignment that had been given to Howard only. (Qureshi Decl., Ex. 1 at 2) (Feb. 17, 2009 Howard's email to Qureshi) ("I didn't learn until Friday afternoon [February 13, 2009] that I was expected to set up the file, versus help Elizabeth set up the file . . . .")). Accordingly, Howard has failed to provide any record evidence supporting her assertion that the CAO or its employees "prevented her from completing the assignment." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is appropriate where facts are "so one-sided that defendant must prevail as a matter of law").

Howard also contends that a reasonable juror could find that Qureshi did not believe she was insubordinate for failing to complete the assignment because he continued to extend the deadline for completion. Doc. No. 74 at 42. However, her

---

**9.** Howard admits that she requested to have her access to the budget drive removed in March 2009 but faults Qureshi for approving her request. This evidence is insufficient. First, Howard assured Qureshi that she would have access to all the necessary information even without this drive. Second, removing access was Howard's idea, not Qureshi's, and

this removal occurred several weeks after the assignment was originally given.

**10.** Howard counters that she also needed access to additional files and staff knowledge in order to complete the assignment. However, she fails to allege that she told any CAO employee that she needed access to these programs.

assertion is contrary to the record, which reflects repeated "disappointment" from Qureshi regarding the status of the project. (Qureshi Decl., Ex. 2, at 4 (Mar. 10, 2009 Qureshi email to Howard)). In fact, the final extension provided to Howard was premised with a threat of disciplinary action if she failed to once again to complete the assignment. Accordingly, no reasonable juror could find pretext on these grounds.

Howard further argues that a reasonable juror could reject the CAO's explanation because the CAO's employees have provided inconsistent explanations for her termination. She underlines the differences between Beard's affidavit and Qureshi's reasoning: Beard's affidavit stated Howard was terminated she refused to "analyz[e] and reconcil[e]" the AE4 file while Qureshi averred that Howard was terminated because she refused to work with Nuti to set up the AE4 file. Doc. No. 76 at 2. Howard also highlights the diverging rationales for her termination provided by Walter Edwards (a Deputy Chief Administrative Officer) and Qureshi. Edwards testified that he believed Howard was terminated for failing to complete "multiple" tasks. Qureshi, on the other hand, testified that Howard was terminated for failing to complete a single task. While inconsistent justifications may in some cases create an issue of fact regarding credibility, these extremely minor discrepancies are clearly insufficient. *See Crockett v. Abraham*, 284 F.3d 131, 133 (D.C. Cir. 2002) (secondhand gap-filling information can potentially rise to a level of contradiction that creates a genuine issue of material fact).[11]

Howard also contends that the CAO's failure to abide by certain policies suggests that it had a discriminatory motive. According to Howard, the CAO had a "policy" of conducting investigations prior to any termination and that it deviated from that policy by not conducting such an investigation in her case. Doc. No. 74 at 27. However, as is the case with so many of Howard's arguments, a close examination of the facts and briefs reveals that she is mischaracterizing the record.[12] In fact, Howard directly contradicts her assertion in a footnote of her own brief, admitting that the CAO did not have a written disciplinary policy at the time of the termination. Doc. No. 74 at 27, n. 12. Instead, she stated that the "process" used depended on the situation and provided no evidence that her disciplinary situation was normally—much less consistently—investigated prior to termination. *Id.* Accordingly, Howard has failed to show any standard policy or any deviation from that policy which might suggest pretext. For

---

**11.** Howard also appears to challenge the nature of the assignment that resulted in her termination. According to Howard, the assignment was to complete the "bullet points" she provided to Qureshi in March. However, the D.C. Circuit's ruling clearly provides that Howard may not "probe any aspect of the Account assignment." *Howard*, 720 F.3d at 952. Moreover, her own subjective view of the scope of the assignment is wholly irrelevant. *See, e.g. Wilson v. LaHood*, 815 F.Supp.2d 333, 340 (2011).

**12.** Howard's briefing has forced the Court to sift through a raft of unsupported assertions in an attempt to find plausible legal arguments, a task in which the Court should not have to engage. *Potter v. D.C.*, 558 F.3d 542, 553 (D.C. Cir. 2009)("judges "are not like pigs, hunting for truffles buried in briefs" or the record). For example, Howard makes the assertion that she was treated differently from Hambric, a white male. She states that Hambric was promoted to HS–15 after his transfer and she was not. However, the very document she cites for this proposition shows this contention to be false; it clearly provides that Hambric was designated as HS–15 *before* the transfer and retained that position upon transfer.

the reasons set forth above, Howard's discrimination claims fail.

## RETALIATION CLAIMS

### A. Legal Standard for Retaliation Claims under 2 U.S.C. § 1317

 Claims of retaliation are also examined under the framework set out in *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[13] *See Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009). To establish a prima facie case of retaliation, a plaintiff must show the following: (1) she engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there existed a causal connection between the protected activity and the materially adverse action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). The plaintiff's burden is not great: She "need only establish facts adequate to permit an inference of retaliatory motive." *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

 Once the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, [non-retaliatory] reason" for its actions. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (internal citations and quotes omitted). Again, if the employer successfully presents a legitimate, non-retaliatory reason for its actions, "the presumption raised by the prima facie case is rebutted and drops from the case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (internal citation omitted). Upon such a showing by the defendant, the district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520 F.3d at 494. In other words, did the plaintiff "show *both* that the reason was false, *and* that ... [retaliation] was the real reason." *Weber v. Battista*, 494 F.3d 179, 186 (D.C. Cir. 2007) (alterations in original and internal quotations omitted) (quoting *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742).

### B. Retaliation

 The CAO asserts that it is entitled to summary judgment regarding Howard's retaliation claim because Howard has failed to carry her burden as a non-moving party responding to a motion for summary judgment.[14] According to the CAO, Howard has failed to point to any portion of the record suggesting that she engaged in statutorily protected activity and, therefore, cannot state a prima facie case for retaliation. In response to a motion for summary judgment, a plaintiff alleging retaliation under 2 U.S.C. § 1317 must identify specific parts of the record that suggest she engaged in *statutorily protected activity*, i.e. complaining about racial discrimination. *See also Holbrook*, 196 F.3d at 262. In other words, Howard

---

13. Here, Howard's status as a House of Representatives employee requires her case be brought under 2 U.S.C. § 1317 instead of Title VII; however the same analysis is employed. *See, e.g., Moran v. U.S. Capitol Police Bd.*, 887 F.Supp.2d 23, 30 (D.D.C. 2012).

14. Howard seemingly interpreted the CAO's motion for summary judgment as conceding the "protected activity" question. However, the CAO's brief clearly stated that Howard failed to provide any specifics regarding the protected activity issue.

must specifically allege that she complained about race-based discrimination and cite to a portion of the record supporting this assertion.

Howard's brief characterizes her March 19, 2009 meeting with the Director of Human Resources Hite as a "protected activity" in the following way: "She engaged in protected activity, i.e. complaining about the assignment and a host of other issues." Doc. No. 83 at 5. She provides no additional explanation or description. This threadbare assertion is startlingly vague and, once again, disturbingly void of any specific assertions or citations to the record. In fact, Howard's brief fails to cite to any portion of the record that would illuminate the content of her discussions with Hite.[15] Taking the facts in the light most favorable to Howard, no reasonable juror could find that her meeting constituted protected activity because Howard has failed to provide any evidence suggesting that she complained of racial discrimination during the meeting.

The CAO further argues that, even if Howard were to establish a prima facie case of retaliation, she cannot show pretext. The CAO articulates the same non-discriminatory reason for termination as set forth *supra*—Howard refused to complete her assignment—and Howard has put forward the same unsubstantiated arguments regarding pretext. Accordingly, the Court's analysis of this issue is the same as discussed *supra*. Therefore, Howard's retaliation claim fails.

### ORDER

For the reasons set forth above, it is hereby ORDERED that:

1. Defendant's motion for summary judgment (Doc. No. 73) is GRANTED; and
2. Judgment shall be entered in favor of Defendant.

---

15. The record demonstrates that Howard alleged race-based discrimination in the form of pay inequality in 2007 and that the CAO provided her with back pay. However, nothing in the record suggests that she referenced this issue when speaking with Hite in this March 2009 particular meeting. Doc. No. 83 at 40.