*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ELLEN WHITE,

        Plaintiff-Appellant,

v

DEPARTMENT OF TRANSPORTATION,

        Defendant-Appellee.

FOR PUBLICATION
October 1, 2020
9:00 a.m.

No. 349407
Wayne Circuit Court
LC No. 17-017679-CZ

Before: RIORDAN, P.J., and SHAPIRO and RONAYNE KRAUSE, JJ.

SHAPIRO, J.

Plaintiff Ellen White brought a claim of employment discrimination against defendant Department of Transportation alleging that she had been denied a promotion as a result of racial discrimination in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2202(1)(a). After she filed suit, defendant took certain actions that plaintiff concluded were in retaliation for having sued the department. Accordingly, she amended her complaint to add a count alleging retaliation in violation of ELCRA, MCL 37.2701(a).

Sometime later, defendant filed a motion seeking summary disposition as to each claim. The trial court granted the motion in full and so dismissed the case. Plaintiff then appealed to this Court. For the reasons stated in this opinion, we affirm the dismissal of plaintiff's failure-to-promote claim, but reverse the dismissal of her retaliation claim.

## I. FACTS & PROCEDURAL HISTORY

Plaintiff is African American. In 2008, she began working as a property analyst (PA) for defendant's real estate services section. Plaintiff's job involved right-of-way acquisition and relocation, meaning she would help acquire property needed for defendant's projects and then find new housing for the former property owners. Beginning in 2015, she was assigned to the Gordie Howe International Bridge (GHIB) project in Detroit. She lived in Lansing and was formally assigned to defendant's Lansing office, but would work in Detroit four days each week during which she would be housed in a local hotel.

-1-

Plaintiff was hired at classification level 10 (PA 10). A year later she was reclassified to a PA 11. She stayed at that level until 2013, when she became a PA 12. In April 2016, defendant posted an opening for a property specialist, classification level 13 (PS 13). This position is responsible for managing defendant's statewide relocation program. There were two applicants for the position: plaintiff and Lori Crysler, who is Caucasian. Crysler was originally hired by defendant in January 2015 as a PA 10 and in February 2016, she was reclassified to a PA 12. Crysler had thirty years' experience in the real estate industry before joining defendant. At the time of application, plaintiff had received a "high performing" annual rating for the past four years. Her ratings in the four years prior to that were "meets expectations." Crysler had received high-performing ratings in her two evaluations. Both candidates interviewed for the PS 13 position in May 2016. The three-person interview panel unanimously selected Crysler for the position.[1]

Plaintiff filed suit in Wayne Circuit Court on December 18, 2017, alleging racial discrimination in violation of ELCRA.[2] At the time of suit, plaintiff was working fulltime in Detroit on the GHIB project and she only went to defendant's Lansing office for biweekly meetings. On January 8, 2018, plaintiff's supervisor rated her 2017 job performance as "needs improvement." This was the first time that plaintiff received a negative annual performance rating. And as a result of the needs-improvement rating, plaintiff was placed under a "performance improvement plan" (PIP) for a period of up to six months, with a formal review to be conducted within three months.

On January 29, 2018, defendant filed a motion for a change of venue to Ingham County, which was later denied. The motion was based in part on defendant's assertion that plaintiff's "assigned duty station is Lansing" and that venue cannot be based on an "employee's temporary work station." On February 13, 2018, plaintiff submitted an affidavit in opposition to the motion in which she stated that her "workstation in Detroit is not 'temporary' " and that she had been working there since about January 2015. Two days later, on February 15, 2018, plaintiff's supervisor sent an e-mail to plaintiff directing her to report to Lansing daily beginning on February 20th and informing her that she would go to Detroit on an appointment basis only. The following week, on February 21, 2018, the supervisor issued plaintiff a notice of "formal counseling" that outlined plaintiff's alleged failure to comply with the PIP and provided new dates for her to show progress. The notice stated that plaintiff's "performance is unacceptable." Plaintiff went on medical leave in March 2018 because of stressful work conditions. She did not return to work before retiring in November 2018.

In August 2018, plaintiff filed an amended complaint adding a retaliation claim on the basis of the negative performance rating and the change in her work location. After discovery was completed, the parties filed competing motions for summary disposition under MCR 2.116(C)(10). The trial court ruled that plaintiff failed to establish a question of fact whether defendant's

---

[1] There was a fourth member of the panel who served as a "hiring manager," but she did not have a vote in the selection.

[2] Plaintiff also alleged age discrimination, but she did not address that claim at the summary-disposition stage. Nor does she appeal the dismissal of that claim. Accordingly, we will not address it.

nondiscriminatory reason for the promotion decision, i.e., that Crysler was the best candidate for the position, was a pretext for racial discrimination. The court granted summary disposition of plaintiff's retaliation claim on the grounds that she failed to identify an adverse employment action.

## II. ANALYSIS

### A. STANDARD OF REVIEW

Summary disposition was granted in favor of defendant pursuant to MCR 2.116(C)(10) on the basis that plaintiff failed to establish a genuine issue of material fact. A trial court's decision on a motion for summary disposition is reviewed de novo. *Spiek v Dep't of Transp,* 456 Mich 331, 337; 572 NW2d 201 (1998). When reviewing a motion brought under MCR 2.116(C)(10), we must view that evidence in the light most favorable to the nonmoving party to determine if a genuine issue of material fact exists. See *Maiden v Rozwood,* 461 Mich 109, 118-120; 597 NW2d 817 (1999). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

### B. PLAINTIFF'S FAILURE-TO-PROMOTE DISCRIMINATION CLAIM

Plaintiff first argues on appeal that the trial court erred by dismissing her discrimination claim because she established a question of fact whether defendant's stated reason for the promotion decision was a pretext for discrimination. We disagree and so affirm summary disposition as to that count.

#### 1. CONTROLLING LAW

ELCRA prohibits employers from discriminating on the basis of race:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [MCL 37.2202(1)(a).]

"The courts have recognized two broad categories of claims under this section: 'disparate treatment' and 'disparate impact' claims." *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 358; 597 NW2d 250 (1999). This case concerns disparate treatment because plaintiff alleges that defendant intentionally discriminated against her on the basis of race. See *Duranceau v Alpena Power Co*, 250 Mich App 179, 182; 646 NW2d 872 (2002).

Because there is "no direct evidence of impermissible bias," plaintiff's claim of intentional discrimination must proceed under the *McDonnell Douglas*[3] burden-shifting framework. *Hazle v*

---

[3] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

*Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). First, the plaintiff must set forth a prima facie case. In *Hazle*, the Supreme Court determined that the "plaintiff was required to present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination."[4] *Id*. at 463. "[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case."[5] *Id*. at 464.

If the defendant gives a legitimate, nondiscriminatory reason for the employment decision, the presumption of discrimination is rebutted, "and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Sniecinski v Blue Cross and Blue Shield of Mich*, 469 Mich 124, 134; 666 NW2d 186 (2003). "At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.' " *Hazle*, 464 Mich at 465, quoting *Lytle v Malady (On Rehearing)*, 458 Mich 153, 176; 579 NW2d 906 (1998).

## 2. APPLICATION

Defendant's nondiscriminatory reason for the employment decision is that Crysler was the best candidate for the position. Plaintiff offers four grounds for concluding that this explanation is a pretext for discrimination.

Plaintiff first argues that Crysler was not qualified for the sought position. The Civil Service Commission determined that Crysler was qualified to apply for the position on the basis of equivalent experience. But in discovery plaintiff established that Crysler made a misstatement in her application that could have affected the Civil Service Commission's eligibility

---

[4] *Hazle* explained that "the elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand." *Hazle*, 464 Mich at 463 n 6. In *Hazle*, the plaintiff lost a sought-after promotion to an outside candidate. *Id*. at 459. The plaintiff alleged discrimination on the basis of race and maintained that she was the more qualified candidate. *Id*. Like *Hazle*, plaintiff is also challenging a promotion decision on the basis of race and she argues that she had more internal experience and was better qualified than the selected applicant. Given the factual similarity, we conclude that *Hazle*'s formulation of the prima facie case is controlling here.

[5] Defendant argues that plaintiff did not present evidence raising an inference of discrimination. However, in its motion for summary disposition defendant conflated the fourth element of the prima facie case with plaintiff's duty to show that the stated reason for the employment decision was a pretext. Perhaps as a result, the trial court also conflated the issues. In any event, because we conclude that plaintiff fails to create a question of fact on pretext, we will assume for purposes of this appeal that she established a prima face case.

determination.[6]  Yet plaintiff has not presented evidence that defendant knew of the misstatement in Crysler's application at the time of the promotion decision.  A similar issue arose in *Hazle*, where the plaintiff claimed that the selected applicant "committed 'resume fraud' in representing her educational and employment background." *Hazle*, 464 Mich at 460.  The Supreme Court held that even if the plaintiff was correct this failed to establish that the employer's nondiscriminatory reason was pretextual because "there is no record evidence that any of this was known to defendants when they made their employment decision."[7] *Id*. at 474.  Although defendant might have discovered the misstatement in Crysler's application, there is no evidence that it did and so it properly relied on the Civil Service Commission's finding that she was qualified.  The discovery of a misrepresentation unknown to the employer until after the promotion decision does not show that race was a motivating factor in the decision.

Plaintiff also argues that she was more qualified and had more experience as a PA than Crysler.  Although plaintiff had more internal experience, Crysler had a substantial amount of real estate experience before joining defendant.  The interview panel clearly valued that experience, and it is apparent from the panel's recommendation memo that Crysler gave an impressive interview.  In any event, plaintiff's subjective claim that she was more qualified does not create a question of fact on whether the employer's proffered reason for the decision is pretextual. *Hazle*, 464 Mich at 476.  Further, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id*. (quotation marks, citation, and alteration omitted).  Plaintiff is essentially challenging defendant's business judgment, which is insufficient to raise a question of fact of whether the nondiscriminatory explanation for the hire was a pretext for racial discrimination.  See *Town v Mich Bell Telephone Co*, 455 Mich 688, 704; 568 NW2d 64 (1997); *Meagher v Wayne State Univ*, 222 Mich App 700, 712; 565 NW2d 401 (1997).

Plaintiff next argues that defendant's employees gave conflicting testimony whether the interview panel was the actual decisionmaker in this case.  As defendant argues, however, plaintiff is not pursuing a "cat's paw" theory of liability under a which a supervisor's discriminatory animus

---

[6] The PS 13 job posting issued in April 2016 required four years' equivalent experience to a PA, including two years equivalent to a PA 11 or one year equivalent to a PA 12.  In her application, Crysler indicated that she had been employed as a PA 12 since January 2015, i.e., she had one-year of actual experience as a PA 12.  In fact, Crysler was hired in January 2015 as a PA 10 and was not reclassified to a PA 12 until February 2016, thus she did not have one year of actual experience as a PA 12.  While plaintiff assumes that Crysler was not qualified given the misstatement, the record does not indicate what the Civil Service Commission would have decided had Crysler accurately stated her employment history with defendant.

[7] The Court noted that under the after-acquired evidence doctrine an employer may not rely on the employee's subsequent wrongdoing to justify the prior employment decision, and reasoned that "a logical corollary of this principle [is] that an employee cannot establish discriminatory intent by offering evidence of facts that were unavailable to the employer when it made its employment decision." *Hazle*, 464 at 475 n 15.

is imputed to the ultimate decisionmaker. See e.g., *Chattman v Toho Tenax America, Inc*, 686 F3d 339, 350 (CA 6, 2012). Indeed, plaintiff has not provided evidence of discriminatory animus as to any of defendant's employees regarding the decision to promote Crysler rather than plaintiff. We therefore do not see how a discrepancy regarding who made the ultimate decision in this case shows discriminatory intent. Moreover, we conclude that the alleged inconsistencies in this case merely show the nuance of defendant's administrative bureaucracy and that they do not create a triable issue of fact on whether the promotion decision was motivated by racial bias.[8]

Finally, plaintiff relies on statistics of defendant's work force to show pretext. There are few published decisions in Michigan addressing the use of statistics to show intentional discrimination. We have recognized that "[t]he use of statistics may be relevant in establishing a prima facie case of discrimination or in showing that the proffered reasons for a defendant's conduct are pretextual." *Dixon v WW Grainger, Inc*, 168 Mich App 107, 118; 423 NW2d 580 (1987). In *Featherly v Teledyne Indus, Inc*, 194 Mich App 352, 360-361; 486 NW2d 361(1992), we characterized the statistics indicating that older employees were most affected by layoffs as "weak circumstantial evidence of age discrimination," but determined that it supported the plaintiffs' prima facie case "especially when conjoined with the other facts evidencing age discrimination." By contrast, in this case there is no separate evidence that race was a factor in the promotion decision, and statistics would be plaintiff's only circumstantial evidence of discrimination.

The use of statistics to prove intentional or disparate discrimination is more settled in federal caselaw. We are not bound by federal precedent interpreting analogous questions under Title VII of the 1964 Civil Rights Act, but that caselaw is generally considered persuasive. *DeFlaviss v Lord & Taylor, Inc*, 223 Mich App 432, 437; 566 NW2d 661 (1997); *McCalla v Ellis*, 180 Mich App 372, 377-378; 446 NW2d 904 (1989). In the Sixth Circuit, "[a]ppropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Peeples v Detroit*, 891 F3d 622, 635 (CA 6, 2018) (quotation marks and citations omitted). But "the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Id*. (quotation marks and citation omitted).

---

[8] Plaintiff relies on testimony that defendant's hiring decisions are made by the sought position's direct supervisor, who is a member of the interview panel. Yet a member of the interview panel in this case explained that the direct supervisor's decision is "fairly easy" when the interview panel is unanimous, as was the case here. In other words, if there is disagreement within the interview panel, the direct supervisor has to make a unilateral decision, but that was not necessary in this case. Plaintiff also relies on testimony that the head of defendant's real estate section reviewed the interview panel's recommendation before giving it to HR. But this does not change the fact that it was the interview panel who selected Crysler. Finally, plaintiff notes that two employees were listed as hiring managers on the panel's recommendation memo. As explained by multiple witnesses, however, hiring managers handled the administrative and compliance aspects of the interview process and did not have a vote in the selection.

Plaintiff points out that African Americans make up 13.9% of Michigan's population but about only 6% of defendant's workforce.[9]  She also relies on statistics regarding the percentage—over a one- or two-year period—of defendant's reclassifications (3%), promotions (4%) and hires (4%) that have gone to African Americans.  However, without additional information regarding the racial composition of the job applicants, these statistics are not sufficient to establish a pattern of discrimination.  As to reclassifications, plaintiff fails to show that there is a significant deviation relative to the percentage of African Americans in defendant's workforce, and the fact that no African American had been hired as a PS 13 in at least the last 15 years is insufficient to establish a pattern of discrimination given that we have not been provided with information regarding the number of postings or the applicant pool for those postings.[10]  See *Hague v Thompson Distribution Co*, 436 F3d 816, 829 (CA 7, 2006) ("[I]f the plaintiffs rely on the racial composition of a workforce as evidence of discrimination it must subject all of the employer's decisions to statistical analysis to find out whether [race] makes a difference.") (quotation marks and citation omitted; alteration by *Hague*).

In sum, plaintiff fails to establish a material question of fact whether defendant's legitimate, nondiscriminatory reason for the promotion decision was a pretext.  Defendant properly relied on the Civil Service Commission's determination that Crysler was qualified for the sought position.  Plaintiff's subjective opinion that she was more qualified for the position does not by itself create a triable question of fact.  The promotion decision was unanimously made by the interview panel and any alleged discrepancy regarding the hiring process is immaterial.  Plaintiff's statistical evidence is not sufficiently probative without additional context and analysis.

## C.  PLAINTIFF'S RETALIATION CLAIM

Plaintiff next argues that the trial court erred by granting defendant summary disposition of her retaliation claim.  We agree.

## 1.  BACKGROUND

Under ELCRA, an employer is liable if it retaliates against an employee for having engaged in protected activity, e.g., opposing a violation of the Act's antidiscrimination provision.  See *DeFlaviss*, 223 Mich App at 436.  ELCRA's antiretaliation provision provides:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a

---

[9] All statistics contained in this opinion are approximate and come from undisputed data provided by plaintiff.

[10] Plaintiff does not claim that the information does not exist or that defendant has withheld such information in discovery.

complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act. [MCL 37.2701(a).]

Here, plaintiff claims that defendant retaliated against her for filing her failure-to-promote lawsuit. In its motion for summary disposition, defendant argued that plaintiff has not submitted evidence sufficient to allow a reasonable jury to conclude that defendant's actions were materially adverse. In reviewing the issue under MCR 2.116(C)(10), we are obligated to consider the evidence and inferences therefrom in the light most favorable to plaintiff. See *Liparoto Const, Inc v Gen Shale Brick, Inc*, 284 Mich App 25, 29; 772 NW2d 801 (2009).

The record is clear as to certain salient facts. First, plaintiff had been working for defendant since 2008; had twice been assigned a higher classification; and in her annual performance reviews received either a "meets expectations" or "high performance" rating from her supervisor.[11] She filed suit on December 18, 2017. Three weeks later, on January 8, 2018, she had her annual performance review for 2017 and for the first time received an unsatisfactory rating: "Needs Improvement."

Second, during this time, plaintiff's failure-to-promote case was progressing and defendant brought a motion to change venue from Wayne County to Ingham County. On February 13, 2018, plaintiff filed her response which included her affidavit that she worked primarily in Detroit. Two days after she submitted that affidavit, on February 15, 2018, defendant informed plaintiff that she was to report to work in Lansing rather than Detroit.

## 2. CONTROLLING LAW

As already noted, while we are not bound by Title VII caselaw, Michigan courts regularly look to it for guidance in interpreting ELCRA. This stems from the fact that ELCRA is "clearly modeled after Title VII . . . ." *Rasheed v Chrysler Corp*, 445 Mich 109, 123 n 20; 517 NW2d 19 (1994). And in this case, we see no reason to depart from the United States Supreme Court's interpretation of the comparable Title VII provisions. ELCRA's antidiscrimination and antiretaliation provisions mirror Title VII's. Like Title VII, ELCRA prohibits employers from discriminating against an individual on the basis of race "with respect to employment, compensation, or a term, condition, or a privilege of employment," MCL 37.2202(1)(a), and also from limiting, segregating, or classifying "an employee or applicant for employment in a way that deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant" because of race, MCL 37.2202(1)(b). See 42 USC 2000e-2(a).[12] The antiretaliation provisions of both ELCRA and Title VII differ from

---

[11] Plaintiff received a "meets expectations" rating for 2008, 2009, 2010 and 2011. She received a "high performance" rating for 2012, 2013, 2014 and 2015. The 2016 review gave plaintiff a high-performance rating but there is a dispute whether that review was fully completed.

[12] 42 USC 2000e-2(a) provides:

It shall be an unlawful employment practice for an employer—

-8-

their respective antidiscrimination provisions in that they bar retaliation or discrimination with no limitation on the type of acts that would be considered unlawful. See MCL 37.2701(a); 42 USC 2000e-3(a).[13]

The controlling case regarding Title VII's antiretaliation provision is *Burlington Northern and Santa Fe Ry Co v White*, 548 US 53; 126 S Ct 2405; 165 L Ed 2d 345 (2006). Prior to *Burlington*, courts had been applying the same standards to discrimination and retaliation cases. Specifically, some federal circuit courts concluded that to establish a claim for retaliation, the alleged retaliatory action needed to involve an "ultimate employment decision" such as hiring, firing, rate of pay or promotion, consistent with the standard for a discrimination case. In *Burlington*, however, the Supreme Court concluded that

> Title VII's substantive provision and its antiretaliation provision are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts. We therefore reject the standards applied in the Courts of Appeals that have treated the antiretaliation provision as forbidding the same conduct prohibited by the antidiscrimination provision and that have limited actions retaliation to so-called "ultimate employment decisions." [*Id.* at 87.]

Significantly, *Burlington* went on to define "materially adverse" as an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 68 (quotation marks and citation omitted), and stated that "the antiretaliation provision, unlike the

---

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[13] 42 USC 2000e-3(a) provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

substantive provision, *is not limited to discriminatory actions that affect the terms and conditions of employment*,"[14] *id*. at 64 (emphasis added).

At the same time, the Court said that Title VII "does not set forth a general civility code for the American workplace"; that "petty slights, minor annoyances and simple lack of good manners" are not are not actionable even if retaliatory; and that the actions must deter reasonable employees, noting that the test is objective. *Id*. at 68 (quotation marks and citation omitted). An objective test does not mean that the ultimate question is for the court; rather, the court must determine if plaintiff has submitted sufficient proofs to establish a question of fact whether or not the action meets the *Burlington* standard. Thus, the decision must be based in the facts of the case, not bright-line or categorial rules as to what actions would or would not deter an employee from objecting to discrimination. As stated in *Burlington*,

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, *a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an* "*act that would be immaterial in some situations is material in others*." [*Id*. at 69 (citations omitted; emphasis added).]

The examples given by the Supreme Court in this passage are telling. It would be easy to hold that not being invited to a training lunch, or having to accommodate a minor schedule change, does not constitute a material adverse action regardless of their effect. However, *Burlington* rejects the idea that certain actions are always or never materially adverse—each case is to be considered

---

[14] In concluding that claims of retaliation are not restricted to actions affecting the terms and conditions of employment, *Burlington* relied on the provisions' textual differences and on the presumption that Congress intended for different words to have different meanings, i.e., Congress would have specified that retaliation was limited to employment decisions if it intended that result. *Burlington*, 548 US at 62-63. The same presumption regarding textual differences in statutes exists in Michigan. "If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word." *United States Fidelity & Guar Co v Mich Catastrophic Claims Ass'n*, 484 Mich 1, 14; 795 NW2d 101 (2009). *Burlington* also reasoned that the objective of the antiretaliation provision, i.e., to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," could not be accomplished by prohibiting only actions "directly related" to employment. *Burlington*, 548 US at 63-64.

on its facts and not by application of a general rule that certain actions are, by nature, not materially adverse.

Notably, defendant does not refer to *Burlington* in its brief. Instead it suggests that we rely on a pre-*Burlington* case, *Pena v Ingham Co Road Comm*, 255 Mich App 299, 312; 660 NW2d 351 (2003), which in turn relied on pre-*Burlington* caselaw from the Sixth Circuit for the proposition that an adverse employment action typically "takes the form of an ultimate employment decision, such as 'a termination in employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' " Quoting *White v Burlington N & SF R Co*, 310 F3d 443, 450 (CA 6, 2002), vacated for en banc rehearing 321 F3d 1203 (CA 6, 2003). However, as discussed, federal precedent applying that standard to retaliation claims was expressly overruled by *Burlington*, 548 US 53.[15] It would be a strange result, to say the least, if we continued to follow Title VII precedent overruled by a United States Supreme Court decision based on the same statutory language found in ELCRA.

We have not addressed in a published ELCRA case whether to follow *Burlington*.[16] We do so here and adopt the reasonable-employee standard for determining whether an employer has committed a retaliatory adverse employment action under ELCRA. Given that the antiretaliation provision does not contain the limiting language used in substantive discrimination provision, there is no basis in MCL 37.2701(a) to limit retaliatory acts under ELCRA to those affecting the terms and conditions of employment such as pay, hiring and firing. The adoption of *Burlington* is also consistent with our long history of applying persuasive Title VII precedent to analogous ELCRA issues absent statutory differences.

### 3. APPLICATION

Plaintiff alleges that defendant retaliated against her in two ways after she filed her lawsuit on December 18, 2017. First, that on January 8, 2018, she was given a negative performance evaluation that required her to work under a PIP, which was expanded in February with additional requirements set forth in a "notice of formal counseling." Second, that the work-location change from Detroit to Lansing affected her ability to perform her job, which involved regularly meeting

---

[15] The Sixth Circuit decision relied on by *Pena* was the case that led to the Supreme Court's decision in *Burlington*. After *Pena* was decided, the Sixth Circuit vacated *Burlington*, 310 F3d 443, and decided the case en banc, holding that the plaintiff was subjected to retaliatory adverse employment actions, *White v Burlington Northern & Santa Fe R Co*, 364 F3d 789 (CA 6, 2004). The Supreme Court affirmed, applying the reasonable-employee standard discussed above.

[16] We have applied *Burlington* in an unpublished decision. See *Rott v Madison Dist Pub Sch*, unpublished per curiam opinion of the Court of Appeals, issued December 21, 2010 (Docket No. 294291), p 3. In other cases, we have noted *Burlington* but held or indicated that the plaintiff's claim failed under that standard without expressly deciding whether to adopt it. See *Aguillar v Saginaw*, unpublished per curiam opinion of the Court of Appeals, issued August 30, 2018 (Docket No. 339016), pp 15-17; *Haase v IAV Automotive Engineering, Inc*, unpublished per curiam opinion of the Court of Appeals, issued December 1, 2011 (Docket No. 298348), p 5.

in Detroit with homeowners and others parties affected by the eminent domain process necessary to the building of the GHIB.

For the reasons already discussed, we reject defendant's argument that imposition of a needs-improvement rating and PIP could *never* deter a reasonable employee from opposing acts of discrimination. Consistent with *Burlington*, we must consider these actions in the context in which they occurred, not in the abstract. Plaintiff had received only positive or satisfactory evaluations during the nine years she worked for defendant until the evaluation conducted one month after she filed her lawsuit. And, a month later, in the midst of a litigation venue dispute, plaintiff was effectively transferred from Detroit to Lansing, which precluded her from performing her duties on-site without regularly commuting to Detroit.

Per *Burlington*, "it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [the employee] and thus constitute adverse employment actions." *Crawford v Carroll*, 529 F3d 961, 973 n 13 (CA 11, 2008). See also *McArdle v Dell Products, LP*, 293 Fed Appx 331, 337 (CA 5, 2008) ("Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide."). We conclude that the imposition of a PIP and plaintiff's effective transfer were not "trivial" acts nor a "minor annoyance," *Burlington*, 548 US at 68, and so the question of whether plaintiff was subject to an adverse employment action should be determined by a jury.

First, the negative evaluation and PIP, in and of themselves, plainly carried a substantial deterrent effect. The PIP includes increased monitoring and an additional mandatory performance review. Civ Serv R 2-3.2(a)(2) (2020). It set dates and requirements for improvement in areas for which plaintiff was rated as needing improvement and required her to meet weekly with her supervisor to review her compliance. The plan also required plaintiff to take multiple courses, including both civil service and substantive real estate classes, to cross-train in other areas within the real estate services section.

Further, imposition of a PIP under the Civil Service Commission Rules may have consequences beyond its requirements. Failure to comply with the plan risks an unsatisfactory "interim rating," which constitutes discipline under the Civil Service Commission Rules "and may be the basis for additional discipline, up to and including dismissal." Civ Serv R 2-3.3(d). A PIP can also lead to formal counseling, as was the case here, where plaintiff was informed—a day after submitting an affidavit opposing defendant's request for a venue change—that her work performance was unacceptable, the obvious implication being that her job and livelihood were at risk.

While defendant argues that negative performance evaluations, PIPs and formal counsel do not constitute discipline or preclude an employee from applying for a different internal position, performance evaluations "may be considered in making employment decisions, including promotion, retention, assignment and training." Civil Serv R 2-3.1(d). Thus, while a needs-improvement rating does not formally preclude an employee from pursuing a different position or promotion, it is highly likely, if not certain, that such a rating will reflect poorly on the employee

and hinder future advancement.[17]   Further, the Civil Service Commission Rules provide that a needs-improvement rating renders the employee "ineligible for reclassification," Civil Serv R 2-3.2(b)(2)(B), and is neither appealable nor grievable, Civil Serv R 2-3.2(b)(2)(A).

In addition to the negative performance evaluation and PIP, plaintiff's retaliation claim is based on her sudden workplace transfer from Detroit to Lansing in the midst of a venue dispute. Again, plaintiff filed this case in Wayne County, and defendant filed a motion to change venue. Plaintiff responded in opposition and attached her affidavit in which she described her duties in Detroit as grounds for venue in Wayne County.  Two days after plaintiff submitted her affidavit, her supervisor informed her that her primary workplace would thereafter be in Lansing, where she was to report to daily and that she would have to drive to and from Detroit for any appointments she had near the worksite.  The timing of this change is clearly more than fortuitous; indeed, it is compelling.  A reasonable jury could readily conclude that plaintiff's work location was changed precisely to affect the underlying litigation, i.e., because she filed suit, defendant transferred her in hopes of making her suit more difficult.  See *Funk v Lansing*, ___ Fed Appx ___, ____ (CA 6, 2020) (Case No. 19-1691), slip op at 16 (stating that "temporal proximity is relevant to causation," and the fact that the employer's action came just two days after the plaintiff made his complaint "is of particular concern.").

Generally, being reassigned closer to one's home would not be a considered an adverse employment action.  However, as discussed, the particular circumstances of the job must be considered in evaluating whether an action is materially adverse.  See *Burlington*, 548 US at 68. Plaintiff explained at her deposition that being at the project location was essential to relocation work because "[y]ou have to be accessible to those property owners.  They may want to come into the office.  They may want you to come out to the field . . . but whatever their issue is that's what you're there for."  She further explained, "You don't know what's going to come up on any given day on any of your parcels. . . .  So you have to be there every day to be accessible to your property owners."  Plaintiff's view that the change in her work location represented a fundamental change in her employment has an objective basis.  It was explained to her when she was offered a job as a PA that the position would require her presence at the project location during the week, and indeed that is what she did until the reassignment.  Because being at the project site was an essential

---

[17] Defendant relies on caselaw that "the effect of a poor evaluation is ordinarily too speculative to be actionable." *Douglas v Donovan*, 385 US App DC 120; 559 F3d 549, 553 (2009).  However, the cited case concerned discrimination, not retaliation.  As discussed, *Burlington* clarified that what constitutes an adverse action for purposes of retaliation is broader than what constitutes an adverse employment action under the substantive discrimination provision.  Further, we reject the suggestion that the potential consequences of an alleged adverse action should not be considered in applying the reasonable-employee standard.  Reasonable people consider possibilities and contingencies when making decisions.  Given that the needs-improvement rating and PIP could lead to discipline (including dismissal) and the hinderance of professional advancement, a reasonable employee would consider those possibilities in deciding whether to make or support a charge of discrimination and could reasonably conclude that it would be better not do so.

part of relocation work, we conclude that the change in plaintiff's work location represented more than a mere alteration of job responsibilities.

Applying *Burlington,* we conclude that the needs-improvement evaluation, the corresponding PIP and the workplace transfer could dissuade a reasonable employee from making or supporting a claim of discrimination under ELCRA. Accordingly, whether plaintiff suffered an adverse employment action in this case is a question for the jury, and the trial court erred by granting summary disposition.

The partial dissent does not dispute that we should follow *Burlington*, but attempts to avoid the effect of that United States Supreme Court case with citations to several federal circuit court cases addressing whether negative performance evaluations or PIPs constitute adverse employment actions. The cited cases do not lead us to change our view. First, many of the cases rely in whole or in part on pre-*Burlington* precedent. For instance, in *Cole v Illinois*, 562 F3d 812, 816-817 (CA 7, 2009)—which is an oft-cited case on this issue[18]—the Seventh Circuit observed *Burlington*'s holding, but then concluded that the PIP in that case was not an adverse action based entirely on cases decided before *Burlington* that were not applying the reasonable-employee standard but instead analyzed retaliation claims under the same standards as substantive discrimination claims.[19] The dissent asserts that the reliance on pre-*Burlington* decisions should be viewed as a determination that *Burlington* did not affect the applicable standards for retaliation cases. However, *Burlington* clearly *did* the change the standard for retaliation cases, and we do not find perfunctory application of pre-*Burlington* caselaw—without any discussion of the fact that the relied-upon cases were decided before *Burlington*—to be a persuasive application of the reasonable-employee standard. And, as noted, such decisions are especially unpersuasive given that the United States Supreme Court made clear that courts should not define whole categories of actions that may not be considered material regardless of context.

---

[18] Three of the cases cited by the dissent rely directly to *Cole*. See *Fields v Bd of Ed of City of Chicago*, 928 F3d 622, 626 (CA 7, 2019); *Payan v United Parcel Serv*, 905 F3d 1162, 1174 (CA 10, 2018); *Langenbach v Wal-Mart Stores, Inc*, 761 F3d 792, 799 (CA 7, 2014).

[19] The same is true as to *Baloch v Kempthorne*, 550 F3d 1191, 1193 (DC Cir, 2008), which concluded that an unsatisfactory performance review should not be considered a materially adverse action and in support cited two cases, each of which was decided prior to *Burlington*. One of those cases, *Oest v Ill Dep't of Corrections*, 240 F3d 605 (CA 7, 2001) was a discrimination case, not a retaliation case, and has since been overturned. See *Ortiz v Werner Enterprises, Inc*, 834 F3d 760, 765 (CA 7, 2016). Similarly, *Langenbach*, 761 F3d 792, relied on *Cole* and a pre-*Burlington* case, *Haywood v Lucent Techs, Inc*, 323 F3d 524, 532 (CA 7 2003), and involved a plaintiff who alleged she was given an unsatisfactory review and was placed on a PIP after she took leave under the Family and Medical Leave Act (FMLA). However, as the *Langenbach* court noted, the plaintiff had "already received low performance evaluations and had been placed on a PIP" *before* she took her FMLA leave. *Langenbach*, 761 F3d at 801. Similarly, defendant's reliance on *Jarvis v Siemens Medical Solutions USA, Inc*, 460 Fed Appx 851 (CA 11 2012), is of little value as in that case the plaintiff did not have a history of positive reviews, as the instant plaintiff did, and failed to show up for work on several occasions and falsified his time card. See *id*. at 855.

The Sixth Circuit has recognized that the *Burlington* standard must be applied on a case-by-case basis. In *Halfacre v Home Depot, USA, Inc*, 221 Fed Appx 424 (CA 6 2007), two months after the plaintiff claimed race discrimination in a failure-to-promote case, he received an evaluation with an overall performance grade that was lower than all of his previous evaluations. His prior evaluations were "generally stellar." *Id*. at 425-426. As part of his case, the plaintiff alleged retaliation, and the defendant's summary disposition motion was granted prior to the Supreme Court's decision in *Burlington*. *Id*. at 426-427. In its decision, the district court held "as a categorical matter, that '[a] performance evaluation that is lower than an employee feels is warranted is not an adverse employment action sufficient to state a claim of discrimination.'" *Id*. at 432. By the time the Sixth Circuit considered the appeal from the district court decision, the Supreme Court had issued its decision in *Burlington*. In light of that decision, the Sixth Circuit reversed, reasoning that the district court's categorical approach "is now suspect. . . . [A lower performance] evaluation could—in certain circumstances— 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" *Id*., citing *Burlington*, 126 S Ct at 2415.

The Sixth Circuit has also recognized that *Burlington* sets forth a "more liberal definition [that] permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Michael v Caterpillar Fin Servs Corp*, 496 F3d 584, 596 (CA 6, 2007). In that case, the court held that "[t]he retaliatory actions alleged by [the plaintiff], including her brief placement on paid administrative leave and the 90–day performance plan," met the "*relatively low bar*" for a materially adverse action for purposes of a retaliation claim. *Id*. (emphasis added). See also *Estate of Olivia v New Jersey*, 579 F Supp 2d 643, 671 (D NJ, 2008) (holding that "[a]n unwarranted negative [performance] evaluation by one's supervisor could have a deterrent effect" and cause "a reasonable worker [to] be dissuaded from making a charge of discrimination.").

The dissent asserts that negative performance evaluations and PIPs must have "tangible job consequences" to be actionable. The dissent does not elaborate on what constitutes a tangible consequence, but indicates with a supporting citation that there must be a financial harm. However, that position cannot be squared with *Burlington*, which held in part that a reassignment of job duties, a change in schedule or even exclusion from a business lunch—without any mention of a pay deduction—could be an adverse employment action. *Burlington*, 548 US at 69-71. Nor is there support for that position in MCL 37.2701(a), which simply prohibits an employer from retaliating or discriminating against a person who engaged in a protected activity. Moreover, ELCRA is remedial and so should be construed broadly in order to accomplish its purpose, *Bachman v Swan Harbour Ass'n*, 252 Mich App 400, 427; 653 NW2d 415 (2002), which, as it relates to retaliation, is to allow employees to report discrimination without a reasonably-based fear of retribution.

In sum, to the extent that cases cited by the dissent hold that a negative performance evaluation or PIP can never constitute an adverse action for purposes of retaliation claim, we decline to follow these cases because they do not contain a persuasive discussion of the reasonable-employee standard. Moreover, that standard must be applied on a case-by-case basis, and here,

plaintiff did not merely receive a negative performance evaluation,[20] she also was placed under a PIP, received a notice of formal counseling, and was effectively reassigned to a work location that was less conducive to performance of her duties. Cf. *Henry v Abbott Labs*, 651 Fed Appx 494, 505 (CA 6, 2016) (holding that a reasonable jury could find that the alleged adverse actions could dissuade a reasonable employee from making or supporting a charge of discrimination when the plaintiff received, in addition to a low performance review, "increased scrutiny, a letter of expectations threatening further action if her performance did not improve, and [was] kept on the training line.").

Viewing the evidence in a light most favorable to the opposing party, we conclude that plaintiff has presented evidence sufficient to create a genuine issue of fact whether defendant's actions were materially adverse, i.e., that such actions "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 US at 68 (quotation marks and citation omitted). A jury could reasonably find that the alleged retaliatory actions taken against plaintiff, i.e., the negative performance evaluation, PIP, and work relocation, were materially adverse. Therefore, we conclude that the trial court erred by granting defendant's motion for summary disposition as to this claim.

## III. CONCLUSION

We affirm dismissal of plaintiff's discrimination claim, but reverse dismissal of her retaliation claim. We remand for further proceedings consistent with this opinion. We do not retain jurisdiction. Neither party having prevailed in full, costs may not be taxed. MCR 7.219(A).

/s/ Douglas B. Shapiro
/s/ Amy Ronayne Krause

---

[20] Several of the cases relied on by the dissent do not involve negative performance evaluations or PIPs, but rather employees who received lower, but still satisfactory, job evaluations. *Thibodeaux-Woody v Houston Community College*, 593 Fed Appx 280, 285-286 (CA 5, 2014); *AuBuchon v Geithner*, 743 F3d 638, 644 (CA 8, 2014); *Weber v Battista*, 494 F3d 179, 184-185; 377 US App DC 347 (2007). Similarly, PIPs were not at issue in the two cases relied on by the dissent involving employee counseling. See *Cheatham v Dekalb Co Georgia*, 682 Fed Appx 881, 889-890 (CA 11, 2017); *Woods v Washington*, 475 Fed Appx 111, 112-113 (CA 9, 2012). Nor did the plaintiffs in in any of the cases cited by the dissent also claim retaliation based on a change in work location.